PROCTER & GAMBLE CO. v. UNITED STATES et al.

(Commerce Court. July 20, 1911.)

No. 9.

**1.** COMMERCE (§ 92*)—UNITED STATES COMMERCE COURT—JURISDICTION—ORDER REFUSING RELIEF—"ORDER."

Act Cong. June 18, 1910, c. 309, 36 Stat. 539, confers on the Commerce Court jurisdiction previously possessed by the Circuit Courts of the United States of cases brought to enjoin, set aside, annul, or suspend any "order" of the Interstate Commerce Commission, also authorizing the Commerce Court to exercise any and all powers of the Circuit Court of the United States so far as may be appropriate to the effective exercise of the jurisdiction conferred, and that nothing contained in the act shall be construed as enlarging the jurisdiction previously possessed by the courts thereby transferred to and vested in the Commerce Court; the jurisdiction so far as conferred, however, being exclusive, and so far as not conferred being reserved. *Held*, that since capacity to sue in the Commerce Court depends on the general equity practice in force in the Circuit Courts, and prior to the creation of the Commerce Court a shipper claiming to be injured by a ruling of the Interstate Commerce Commission refusing to annul a private car demurrage rule could have sued in the Circuit Court to set aside the commission's ruling, such ruling, though granting no affirmative relief, should be construed as an "order" of the commission which the Commerce Court had jurisdiction to review on petition of the person conceiving himself injured thereby.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 92.*

For other definitions, see Words and Phrases, vol. 6, pp. 5017–5023; vol. 8, p. 7739.]

**2.** COMMERCE (§ 92*)—UNITED STATES COMMERCE COURT—JURISDICTION.

In determining whether the Commerce Court had jurisdiction of a petition to annul a ruling of the Interstate Commerce Commission sustaining a carrier's demurrage rule, it was not material that suits in that court to enjoin, set aside, annul, or suspend any order of the commission are required to be brought against the United States, nor that under the law as it previously stood the venue of suits in the Circuit Courts of the United States against the commission to vacate its orders was fixed in each case in the district where the carrier against which the order was made had its principal operating office.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 92.*]

**3.** COMMERCE (§ 92*)—INTERSTATE COMMERCE—RULINGS OF COMMISSION.

Though it was proper, if not necessary, for a shipper objecting to a carrier's demurrage rule to apply first to the Interstate Commerce Commission for relief, the fact that the commission merely dismissed the petition without granting any affirmative relief did not render its action conclusive, so as to deprive the shipper of the right thereafter to proceed to have the commission's ruling reviewed by the Commerce Court on the ground that the demurrage rule was confiscatory as to the shipper, and, if sustained, would deprive it of its property without due process of law.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 92.*]

**4.** CARRIERS (§ 26*)—DEMURRAGE—PRIVATE TANK CARS.

Since carriers engaged in interstate commerce are entitled to impose, as a condition to hauling private cars, such terms as have a reasonable relation to the transportation service in which they are employed, and may adopt such rules as will tend to provide a reasonably dependable supply of equipment and prevent the withdrawal of such cars at will, to serve the private purposes of the owners and as will keep them in active

and steady use, a rule imposing a reasonable demurrage charge on such cars while standing on private tracks and while returned unloaded until the lading is removed and the cars released, is reasonable and not violative of the owner's rights.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

Petition by the Procter & Gamble Company against the United States and others to set aside an order of the Interstate Commerce Commission (19 Interst. Com. R. 556) refusing to annul a provision of the Uniform Demurrage Code, requiring privately owned cars while standing on private tracks to pay demurrage under certain circumstances. Petition dismissed.

George H. Warrington, for petitioner.
P. J. Farrell, for Interstate Commerce Commission.
Blackburn Esterline, for United States.
Edward Barton, for respondent railroads.

Before KNAPP, Presiding Judge, and ARCHBALD, HUNT, CARLAND, and MACK, Associate Judges.

ARCHBALD, Judge. The Procter & Gamble Company, the petitioner, is engaged in the manufacture of soap, and the refining of cotton seed and other oils, and owns large industrial establishments at Ivorydale, Ohio, Port Ivory, N. Y., and Kansas City, Kan. In all its plants it has and maintains private railroad tracks, for the purpose of receiving cars from the interchange tracks which connect it with the respondent railroads. At two of the places named it owns and employs its own locomotives and itself performs the entire switching of cars, and at the other the switching is performed by the railroads under contract, which is paid for separate and apart from the transportation charges. In every instance the tracks are owned by the company and are on its own land, and the railroads have no interest or control over them.

The Procter & Gamble Company is also the owner of 532 oil-tank cars, which it has purchased at a cost of about $500,000. These cars are necessary for the transportation of the oils, grease, and other like commodities used by the company in its business, and were purchased by it in relief of the railroads, which were and are not prepared to furnish them. These tank cars, when loaded by the petitioner at its several establishments, are tendered to the connecting railroads for shipment, and are hauled to their various destinations at the regular published rates for the respective commodities with which they are loaded. The use of these cars is confined to the petitioner's business, and in consideration of the petitioner furnishing them an allowance is made by the railroads of three-quarters of a cent a mile per car for each mile that it is hauled; this allowance being in accordance with the published tariffs of the railroads with respect to the movement of all private tank cars.

Until the adoption of the rule set forth below, no demurrage was ever charged by any of the respondent railroads for delay in unload-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing private tank cars while standing on the private tracks of the owner. But beginning in February, 1910, and following that, the railroads have published, as part of their so-called "Uniform Demurrage Code," the following rule, which is the subject of this controversy:

"Private cars while in railroad service, whether on the carrier's or private tracks, are subject to these demurrage rules to the same extent as cars of railroad ownership.

"Empty private cars are in railroad service from the time they are placed by the carrier for loading, or tendered for loading on the orders of the shipper.

"Private cars under lading are in railroad service until the lading is removed and the cars are regularly released.

"Cars which belong to an industry performing its own switching service are in railroad service from the time they are placed by the industry upon designated interchange tracks, and thereby tendered to the carrier for movement. If such cars are subsequently returned empty, they are out of service when withdrawn by the industry from the interchange; if returned under load, railroad service is not at an end until the lading is duly removed."

The demurrage rules, of which this is a part, were prepared by a committee of the National Association of Railway Commissioners, composed of a representative from each state having a railroad commission, and a member of the Interstate Commerce Commission; and were adopted by the association in convention and later approved, although not prescribed, by the Interstate Commerce Commission.

After the publication of the rule in controversy, but before it had gone into effect, the Procter & Gamble Company made complaint to the Interstate Commerce Commission, and sought to have the rule set aside, in so far as it permitted the railroads to make a demurrage charge against the private cars of the company after they had been delivered to it and were standing on its own private tracks. But after a due hearing the commission dismissed the complaint, and the respondent railroads are now exacting demurrage charges in accordance with the provisions of the rule.

[1] The proceedings in this court are brought to set aside the order of the commission dismissing the complaint and refusing relief; the allegation being made that the rule, in so far as it provides that privately owned cars under lading on private tracks are in railroad service, and so subject to a demurrage charge until the lading is removed, is unjust and unreasonable and deprives the company of the right to use its private cars on its private tracks for its own purposes unless demurrage is paid therefor, thereby permitting the respondent railroads to deprive the company of its property without due process of law, in violation of the fifth amendment to the Constitution and the acts regulating interstate commerce. The prayer of the petition is that the order of the commission dismissing the complaint may be annulled and the respondent railroads enjoined from collecting the demurrage charge, and that they may be further required to repay to the petitioner the sums which they have wrongfully collected from it under the rule.

The United States moves to dismiss the petition on the ground that this court has no jurisdiction in the premises; or that, if it has, no

cause of action is made out which entitles the petitioner to relief. And in this motion the Interstate Commerce Commission and the several railroads which have been summoned as respondents join.

The jurisdiction of this court is denied on the ground that the petitioner is a shipper, and the Interstate Commerce Commission having merely dismissed the complaint which was made to it, and granted no affirmative relief, that there is nothing in the order of dismissal which it entered that affords any basis for action here. Or, in other words, that it is only the carrier against which an order is made in favor of the shipper that can bring the case for review into this court; the shipper being concluded by the action of the commission, whatever it may chance to be. This is a serious question, which merits careful consideration and is not altogether easy to solve.

By the act by which the Commerce Court was created (Act June 18, 1910, c. 309, 36 Stat. 539), it was given "the jurisdiction now possessed by Circuit Courts of the United States and the judges thereof" of, inter alia, "cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission." It was also therein further provided that "in all cases within its jurisdiction the Commerce Court and each of the judges assigned thereto shall respectively have and may exercise any and all the powers of a Circuit Court of the United States, and of the judges of said court respectively, so far as the same may be appropriate to the effective exercise of the jurisdiction hereby conferred"; and, conversely, that nothing in the act should be construed as enlarging the jurisdiction at the time possessed by said Circuit Courts, or the judges thereof, thereby transferred to and vested in the Commerce Court; the jurisdiction, however, so far as conferred, to be exclusive, and so far as not conferred being reserved. The question, then, is whether upon any recognized ground of equity practice the present petitioner, under the law as it previously stood, would have had the right to apply by bill to a Circuit Court of the United States to set aside the action of the Interstate Commerce Commission dismissing its complaint, and to enjoin the enforcement by the railroads of the demurrage charge which in effect was thereby approved.

[2] It is of no significance in this connection, nor of any assistance in the solution of the question, that suits in this court to enjoin, set aside, anul, or suspend any order of the commission are required to be brought against the United States. It is just as consistent that the United States should be the respondent in cases brought for this purpose by the shipper as in cases brought by the carrier; the government in each case standing for the order of the commission which it is thus appointed to justify and defend.

Neither does it detract from the jurisdiction of this court that, under the law as it previously stood, the venue of suits brought in the Circuit Courts of the United States against the commission to set aside its orders was fixed in each case in the district where the carrier against which the order was made had its principal operating office; jurisdiction to hear and determine such suits being in terms vested in the courts of such district. Act June 29, 1906, c. 3591, §

16, 34 Stat. 592 (U. S. Comp. St. Supp. 1909, p. 1162). This was a favor to the carrier adversely affected by the order. And, according to the law at the time, the commission being the respondent, provision had to be made for jurisdiction over it by the courts of the various districts throughout the country where it was liable to be summoned. It was to meet this situation that jurisdiction was given in terms over suits of the character mentioned to the courts of the district where the carrier against which the order was made had its principal office. Nothing more was intended, and nothing more is to be made out of this provision of the law. Certainly nothing adverse to possible suits by others than the carrier is to be thereby implied.

The real argument against the right of suit, where the complaint of a shipper has been dismissed, is that the denial of relief by the commission is not an order of which the courts can lay hold. Such an order, it is urged, must be one specifically requiring that something shall or shall not be done before this is the case. In Peavey v. Union Pacific Railroad (C. C.) 176 Fed. 409, it is said:

"A careful search of the interstate commerce act discloses no limitation of the parties who may maintain suits to enjoin, set aside, annul, or suspend an order of the commission, to those who were parties to the proceedings before it, upon which the order was based. The proceeding in court is not an appeal; it is a plenary suit in equity. * * * The determination of the question what parties may maintain such suits is left by the * * * act to the general rules and practice in equity, and under them any party whose rights or property are in danger of irreparable injury from an unauthorized order of the commission may appeal to a federal court of equity for relief."

There was an order of the commission in that case, however, which prohibited the railroads from paying to complainants, and others who were owners of elevators located upon their lines, any compensation for the elevation of grain in transit, so that the law was unquestionably met so far as there being an order is concerned; and the case therefore decided nothing more than that the right to resort to the courts is not confined to the carrier, but extends to every one injuriously affected by the order of the commission, even though not a party to the proceedings before it in which the order was made. To that extent, but no further, it is pertinent here.

[3] Putting aside, however, for the moment, the provisions of the statute, and considering the case as though it had not been passed, it is clear that a shipper would have been entitled, in one form or another, to redress in court against an unjust and unlawful charge or practice imposed by a carrier, such as the one here is alleged to be. And it would have been permissible, therefore, for the Procter & Gamble Company, denying the right of the carrier to make this demurrage charge, to have refused to pay it and compel the carriers to bring suit therefor; or, in view of the complications to which this would give rise, to say nothing of the multiplicity of suits with different carriers which would be likely to ensue, and in order to settle the matter as to all parties once for all, it would have had the undoubted right to go into a court of equity by bill and have the legality of the practice tested, and, if found to be unjustified, enjoined. Donovan v. Pennsyl-

188 F.—15

vania Co., 199 U. S. 279, 26 Sup. Ct. 91, 50 L. Ed. 192. Indeed, the only question would seem to be whether this was not the course which the company, even considering the provisions of the statute, was required to pursue; the legality of the demurrage charge being the only thing involved, and that being a matter for the courts and not for the commission to decide. Hite v. Central Railroad of New Jersey, 171 Fed. 370, 96 C. C. A. 326. See, also, Danciger v. Wells Fargo & Co. (C. C.) 154 Fed. 379, and Langdon v. Pennsylvania R. R. (C. C.) 186 Fed. 237. It was decided, however, in Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, that redress by a carrier against an unjust and unreasonable rate must be sought in the first instance by proceedings before the commission, and that only after that could an action be maintained against the carrier for reparation based on the result. This conclusion was reached, and the common-law right of action otherwise existing held to be abrogated by implication, in view of the system established by the enactments with regard to rate regulation by the Interstate Commerce Commission, and as necessary to the efficiency of that system, which otherwise would be subverted and made nugatory. And this was repeated in Baltimore & Ohio Railroad v. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292, where it was held that, for the correction of an unequal distribution of cars, a shipper was similarly required to go to the commission, and could not in advance of its action seek to remedy by mandamus the discrimination alleged. And Morrisdale Coal Co. v. Pennsylvania Railroad, 183 Fed. 929, 106 C. C. A. 269, also, is to the same effect. But, if that be so, there can be no serious question as to the propriety, if not the necessity, for the present petitioner going first to the commission to have determined whether the demurrage charge in controversy was a just and reasonable requirement. And it cannot be that the implication by which this is brought about is to be carried so far as to make the action of the commission conclusive where relief is denied. There is no such compelling necessity in order to save the system; nor is the statute to be construed as requiring exclusive resort to a tribunal where the rights of the party can be only partially determined at the sacrifice of other rights which the courts of the land are appointed to consider and defend. This is not to deny that in questions of fact, or where judgment or expediency is involved, the action of the commission in denying relief, the same as in granting it, may not be final. But where, as here, it is not the amount that is in dispute—$1 a day per car being recognized as reasonable if there is to be any charge—but the right of the carrier, under the circumstances, to make any charge at all, it is not to be implied, unless there is no escape from it, that the decision of the commission adverse to the shipper is to foreclose the question. And while the dismissal of a complaint by the commission in a case like the present one may not in strictness be an order, in that it does not require or prohibit that anything shall or shall not be done, it is so in substance and effect, in that, by refusing to interfere with the practice or the charge complained of, it virtually approves it and makes it operative. If it was required by the act to hold that a court

could not interfere with such an order however confiscatory to the shipper it might be, the shipper being thus without legal redress, the act might well be declared unconstitutional as wanting in due process of law.

The action of the commission, if to be given any force, having thus the effect of an adverse decision with respect to the question involved, must be regarded, even though negative in character, as an order within the meaning of the statute, which the courts may enjoin or set aside if legal or equitable grounds for doing so are found to exist. The petitioner therefore correctly came into this court, as it could previously have gone into a Circuit Court of the United States —the requisite amount being involved and the case being one arising under the federal law—to have the action of the commission dismissing its complaint set aside and the demurrage charge disallowed, if that should be the conclusion reached with regard to it, either by direct decree or by remanding the case to the commission with directions to sustain the complaint.

[4] But, while the jurisdiction of this court in the premises is thus sustained, we are forced to conclude, upon a consideration of the merits, that the demurrage charge in controversy was lawfully imposed, and that the petitioner therefore has no just ground for complaint. The argument against the charge proceeds upon a misconception. Baldly put, as an exaction for the use by the shipper of his own cars while standing on his own private tracks, the right to it might well be questioned. Neither is it to be sustained as compensation to the' carrier for an additional service not covered by the transportation charge, that is to say, for the storage of the freight with which the cars are loaded, that storage being in the cars and on the tracks of the shipper and not in or on anything which the carrier has supplied. In re Demurrage on Private Tank Cars, 13 Interst. Com. R. 378, 381. It is difficult also to see how the imposition of demurrage on private cars for delay in unloading is necessary to prevent unjust discrimination; the shipper who is able to provide such cars having an advantage over those who cannot, which this regulation is supposed to correct. The ability to own private cars is a mere matter of capital which the undue withholding or the prompt unloading and releasing of them can hardly affect, and the difference in financial circumstances is an advantage, which the law cannot undertake in this way to overcome. Peavey v. Union Pacific Railroad (C. C.) 176 Fed. 409, 419. It may not be consistent also with the exaction of this charge that, provided only the cars are unloaded within the free time allowed, they may be reloaded and retained by the shipper indefinitely without any claim being made for demurrage. If this, which is the practical construction of the rule, is to be accepted as the correct one, it throws serious doubt on its validity, the real ground on which the charge is to be sustained being the right of the carrier to have the cars promptly returned into service, which this has the effect to undo. Nor is the condition of the cars, once they have been delivered to the shipper, whether loaded or unloaded, of any concern to the carrier, except as an end to getting them back into use again. And there is also an ap-

parent inconsistency in holding inbound cars liable to demurrage after they have been delivered and are on the tracks of the owner until they are unloaded, barring the free days, and yet in imposing it on outbound cars without regard to when they are loaded, only from the time they are placed on the interchange tracks. The justification of the rule is therefore to be sought in something outside of all this, upon a determination of the real principle involved.

It is not necessary to decide whether a railroad can refuse or be required to haul private cars. Whatever may be its duty in this regard, it is conceded that such terms may be imposed as a condition to hauling them as have a reasonable relation to the transportation service in which they are employed. And this concession necessarily sustains the present charge. In using these cars, whether as supplementary to or in place of their own, the railroads are entitled to require that there shall be a reasonably dependable supply, and that such cars shall not be withdrawn at will to serve the private purposes of the owners, but shall be kept in active and steady use, and to that end that they shall be put on a footing in this respect with other cars. The interest of the carrier that this should be the case is clear. For the time being these cars become a part of the rolling stock of the road, taking the place of those which the carrier would otherwise be called upon to supply. Cf. State v. Cin. N. O. & T. P. R. R., 47 Ohio St. 130, 23 N. E. 928. It may be that there are some kinds of these cars, such as the tank cars here, which the railroads do not keep on hand, but rely on each shipper furnishing his own. But that does not change the principle involved. In one form or another, the carrier is bound to supply the necessary transportation facilities for handling every kind of freight. And this, not to one shipper only, but equally and without discrimination to all. And it is put at a disadvantage and an extra burden upon it imposed if it cannot be assured with regard to the supply of cars on which it can depend, but is liable to run short or be in excess, according as private cars are released or withheld. This the demurrage charge which is complained of is calculated to overcome, and therefore may justly be imposed. The purpose of demurrage is to force the cars back into use. Delay is made expensive, so that it may be an object to the shipper which he cannot afford to disregard. Its exaction from private cars, the same as others, is therefore neither arbitrary nor unjust.

Nor is it violative of the owner's rights. It is simply a condition to the acceptance of his cars, which, for the reasons given, the carriers have found it necessary to impose, and with which, therefore, he must expect to comply. Presumably the use of these cars operates to his advantage, or he would not be at the expense of supplying them. But he cannot expect that the advantage shall be all on one side. And it having been found by experience that demurrage on private, the same as on public, cars is a necessary transportation regulation, which is justified on principle, the carriers were within their rights in imposing it by the rule in question, and it must therefore be sustained.

The petition will be dismissed on the merits, with costs.

KNAPP, Presiding Judge (concurring). The conclusion reached in this case is undoubtedly correct, and I disagree with the foregoing opinion only so far as it questions the right to enforce the demurrage rule in controversy for the purpose or in aid of preventing undue preference and advantage to the owners of private cars. The commission based its decision in part on this ground and, in my judgment, was right in so doing.

### NOTE ON CONSTITUTION OF COURT BY JUDGE ARCHBALD.

The United States Commerce Court was created by Act of Congress June 18, 1910, 36 Stat. 539; its principal jurisdiction being to review the orders of the Interstate Commerce Commission. It is composed of five Circuit Judges, four of whom are necessary to constitute a quorum. The President was authorized to appoint the first incumbents, who, by the provisions of the statute, were to serve for five, four, three, two, and one year, respectively; and in accordance with this President Taft, on December 12, 1910, appointed Hon. Martin A. Knapp, Chairman of the Interstate Commerce Commission, to be the Presiding Judge, to serve for the term of five years; Hon. R. W. Archbald, United States District Judge of the Middle District of Pennsylvania, to serve for four years; Hon. William H. Hunt, United States District Judge of Montana, to serve for three years; Hon. John E. Carland, United States District Judge of South Dakota, to serve for two years; and Hon. Julian W Mack, of the Illinois Court of Appeals, to serve for one year. These appointees were afterwards confirmed by the Senate. With regard to the subsequent membership of the court, it is provided that, on the termination of the period for which any of the judges is designated to serve, the Chief Justice of the United States shall designate his successor from among the Circuit Judges in commission; the judges as designated above being competent to be redesignated, so far as their terms do not extend beyond the year 1914, after which at least a year is required to intervene before there can be a redesignation.

The judges above named met and organized the Commerce Court at Washington, D. C., on February 8, 1911, and fixed on February 15th as the time when it would be opened for business. The first regular term was held, and the first cases were heard and argued, on April 3d following, and the above is the first opinion rendered.