although he had no counsel, and although excessive commissions were allowed each year. Upon one accounting he did have counsel, and in addition the counsel was allowed $25, the propriety of which payment is not questioned. The commissions generally are a full compensation for the care and management of the securities of the estate and for transacting its business, and cover all services which the surrogate is permitted to allow to the executor as such. He may allow counsel fees, but that is to reimburse him for fees paid counsel, and in some cases not necessary to consider here certain other allowances may be made. But in a case of this kind the surrogate was absolutely without jurisdiction to grant to the executor any counsel fee or allowances of that nature. The executor and the surrogate both are presumed to know the law, and both are presumed to know that no allowances could be made the executor for these items. But they were made, and we are to assume that the surrogate had some foundation for his action.

It appears that the executor asked the allowances. The guardian ad litem consented, and they were allowed. Evidently by the request for the allowances the surrogate may have been led to believe that some services by counsel had been performed for which these allowances were to reimburse the executor. But such was not the fact. Unless the surrogate intended deliberately to violate the law, and grant the infant's money to the executor without any authority, we must assume that in some way he was overreached by the executor. When an executor obtains an allowance in his account for charges clearly unwarrantable, and which the surrogate had no jurisdiction to allow, it is, I think, a fraud within the meaning of subdivision 5 of section 382 of the Code of Civil Procedure, in which case the statute of limitations begins to run at the time of the discovery of the fraud. I do not think the infant was chargeable with knowledge of the provisions of these decrees. She had the right to assume that the executor, the surrogate, and the guardian ad litem had performed their duty, and until she had actual knowledge of the fraud the statute did not run against her.

I think the plaintiff is entitled to relief as to the allowances for costs and counsel fee, except as to the $25 paid the attorney.

---

(158 App. Div. 352.)

TROY WASTE MFG. CO. v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Third Department. September 10, 1913.)

CARRIERS (§ 197*)—TRANSPORTATION OF GOODS—REFUSAL TO DELIVER—LIABILITY.

Plaintiff delivered goods to defendant for transportation over its railroad lines and the lines of certain connecting carriers under a contract which provided that property not removed by the party entitled to receive it within 48 hours after notice of its arrival had been duly sent or given might be kept in the car, depot, place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage and to the carrier's responsibility as a warehouseman only, or might be at the carrier's option removed to and stored in a public warehouse at the owner's

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cost and risk and without liability on the part of the carrier and sub-ject to a lien for all freight and other lawful charges, including a rea-sonable charge for storage, and that the owner or consignee should pay the freight and all other lawful charges accruing on the property and, if required, pay them before delivery. The consignee refused to accept the goods, and after they had been held for some time at the point of destination plaintiff directed their return to it. Upon their return defend-ant refused to deliver them to plaintiff without payment of a charge made by the carrier at the point of destination for the detention of the car during the time they were held there. *Held* that, by refusing to de-liver them, defendant converted the goods and was liable for their value, less the freight charges for their return.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 891–900; Dec. Dig. § 197.*]

Kellogg and Lyon, JJ., dissenting.

Appeal from Rensselaer County Court.

Action by the Troy Waste Manufacturing Company against the New York Central & Hudson River Railroad Company for conver-sion. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOW-ARD, and WOODWARD, JJ.

Visscher, Whalen & Austin, of Albany (William L. Visscher, of Albany, of counsel), for appellant.

Thomas S. Fagan, of Troy, for respondent.

WOODWARD, J. The complaint alleges that the plaintiff is a domestic corporation engaged in business in the city of Troy; that the defendant is a domestic railroad corporation engaged in domestic and interstate commerce; and that on the 28th day of February, 1910, the plaintiff caused to be shipped by the defendant to Covington, Ky., 24 bales of gunny bagging, containing 20,402 pounds, and prepaid the freight thereon, amounting to $34.68; that said merchandise was re-jected by the consignee at Covington, Ky., and that thereupon and immediately directions and orders were given to the defendant by both the consignee and this plaintiff to reship and return said merchandise to Troy, N. Y.; that said merchandise was reshipped and returned and conveyed by the defendant to Troy, N. Y., and the plaintiff was notified that said merchandise had been reshipped and was at a depot of the defendant at Green Island; that the plaintiff then and there-upon offered to pay to the defendant the freight charges from Cov-ington, Ky., to the city of Troy, N. Y., amounting to $41.82, and de-manded of said defendant that said merchandise be delivered to this plaintiff, but the defendant unlawfully refused to accept said freight charges and unlawfully refused to deliver said merchandise to plain-tiff and unlawfully refused to allow and permit plaintiff to take said merchandise from its depot and station at Green Island aforesaid, all to the damage of this plaintiff of $174.44. It is then alleged that the plaintiff is the owner of the merchandise and is entitled to the imme-diate possession of the same; that the defendant unlawfully and ille-gally retains possession of the same, and unlawfully and illegally re-fuses to deliver the same to the plaintiff, and in like manner refuses.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to permit the plaintiff to take the same, although the plaintiff has duly demanded of the defendant that it deliver same to the plaintiff and allow and permit the plaintiff to take the same after paying the freight charges thereon from Covington to Troy; and that the defendant has thereby and by reason thereof converted the same to its own use, to the damage of this plaintiff. The value of the gunny bagging is alleged to be $216.26, and the plaintiff claims damage for this amount, less the sum of $41.82, conceded to be due to the defendant for freight charges upon the goods.

The defendant's answer admits the corporate capacity of the defendant and the fact of its carrying on the business of a common carrier. It likewise admits that on or about the 28th day of February it received certain property at its Green Island depot consigned to Overman & Schrader Company, Covington, Ky.; that said merchandise was duly transported to destination over the lines of defendant and its connecting carriers and upon arrival at destination was tendered to the consignee, and that the said consignee thereafter refused to accept the same; that thereafter, in pursuance of orders from the plaintiff so to do, the said property was returned to the defendant at Troy, N. Y. It also admits that the plaintiff paid the charges for the transportation of the said property from Green Island to Covington, Ky., and on the return of said property offered to pay defendant the transportation charges from Covington to Troy, amounting to $41.82, and demanded delivery of said property upon payment of said freight charges. After denying knowledge or information as to the value of the property, the answer "upon information and belief denies the allegations of the complaint and each and every of them not hereinbefore controverted or admitted."

The evidence submitted upon the trial of the action clearly established the facts alleged in the complaint which were thus denied, so that it cannot be fairly questioned that the plaintiff established the cause of action alleged, and the only questions arising upon this appeal relate to the defendant's "second and separate defense, and for a counterclaim to the alleged cause of action set forth in the complaint." This alleged counterclaim realleges the formal matters set forth in its answer and "further alleges that the said property was received and transported by it under and pursuant to the terms of a written contract, a copy of which is hereto annexed, marked Exhibit A, and made a part of this answer, which contained, among others, the following provisions (no such exhibit is found in the record, with the exception of the excerpts, which are quoted from the alleged contract, and which appear to have been curtailed):

"Sec. 5. 'Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot or place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage.' * * * "

"Sec. 8. 'The owner or consignee shall pay the freight and all other law-

ful charges accruing on said property, and if required, shall pay the same before delivery. If, upon inspection it is ascertained that the articles shipped are not those described in this bill of lading, the freight charges must be paid upon the articles actually shipped.' "

This so-called counterclaim then alleges that Covington is not upon the line of the defendant's railroad but is upon the line of the Chesapeake & Ohio Railway Company; that the defendant duly transported the said property over its road and delivered the same to its connecting carrier on the route to destination; that, after the arrival of said property at destination, the Chesapeake & Ohio Railway Company duly notified consignee of the arrival thereof; that 38 days, exclusive of Sundays and holidays, elapsed between the date of the said notice of arrival to consignee of said property and the receipt of orders from the plaintiff to return the said property to Troy, N. Y.; that the charges for the detention of said car containing the said property for said 38 days, as provided in the tariffs of said Chesapeake & Ohio Railway Company, duly published and filed with the Interstate Commerce Commission, amounted to the sum of $38; that upon the return of said property to Troy, N. Y., the defendant offered to deliver the same to the plaintiff herein upon the payment of the freight charges from Covington, Ky., to Troy, N. Y., amounting to $41.82, plus $38 demurrage charges, but that the plaintiff refused to pay the said charges; that in accordance with defendant's tariffs, duly published and filed with the Interstate Commerce Commission, there have accrued upon said car load of property demurrage charges at the rate of $1 per day, exclusive of Sundays and holidays, since the 30th day of June, 1910, to and including the date of the commencement of this action, viz., June 3, 1911, amounting in all to $279. The defendant then demands judgment for this sum, with the freight charges and demurrage added.

The judgment dismisses the counterclaim and gives the plaintiff the relief demanded in the complaint; the defendant appealing from the judgment.

Having before us only the portion of the alleged written contract set out in the answer, it may be assumed that the provisions quoted are most favorable to the defendant's counterclaim, and it is worth while to look into the pleadings to see if there is a counterclaim pleaded. The provision of section 5 of this alleged contract is that if the property is not removed within 48 hours by the party entitled to receive it, after notice of its arrival has been duly sent, it "may be kept in car, depot or place of delivery of carrier, or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as a warehouseman only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner, and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage," and here the language of the contract is cut off, though evidently continuing. Obviously the first provision quoted of the contract had relation to the obligations of the consignee in respect to the goods, and assumes the same are to be received by the consignee, and merely stipulates for a

delivery other than a personal delivery to the consignee. It provides in place of the common-law contract that the common carrier is bound not only safely to convey but safely to deliver a parcel which he has undertaken to carry, at the place to which it is directed, to the consignee personally (Fisk v. Newton, 1 Denio, 45, 47, 43 Am. Dec. 649); that delivery may be made to the carrier as a warehouseman; and that the consignee will pay the expenses of such a delivery. But the charge against the person receiving the goods is "a reasonable charge for storage," and the liability of the carrier is stipulated to be merely that of a warehouseman, so that if the consignee had received the goods in question, in the manner in which it was stipulated he might receive them, the charges would have been limited to reasonable charges for storage. As a warehouseman the defendant's connecting carrier might have a lien upon the goods for their storage during any delay that the consignee might occasion, but just how the defendant, as the initial carrier, could have any lien upon the goods in question for the use of a car in which it is inferentially averred that the goods were stored for a period of 38 days, and which was subsequently used in reshipping the goods to the plaintiff, is not quite clear. There is no provision in the contract, so far as it relates to the carrier in the capacity of a warehouseman, which pretends to give the defendant a lien for these charges; it simply provides that upon a delivery, such as is provided for, the goods shall be "subject to a reasonable charge for storage." In the absence of agreement or statute, the lien upon goods for the storage charges extends only to cases of those engaged in the business of public warehousemen, and not to mere volunteers, or to cases of private storage (30 Am. & Eng. Encyc. of Law, 63); and it has been uniformly held in this state that the common-law lien given warehousemen does not extend to cases of private storage. Merritt v. Peirano, 10 App. Div. 563, 565, 42 N. Y. Supp. 97, 99, and authorities there cited, affirmed on opinion below 167 N. Y. 541, 60 N. E. 1116. In the case cited it was said:

"The lien of warehousemen is now governed by statute (chapter 526, Laws of 1885), which gives a lien only to a warehouseman or a person lawfully engaged exclusively in the business of storing goods, wares, and merchandise for hire. This statutory provision would seem to deny a lien to persons storing goods who did not come within the terms of the statute."

See Alton v. New York Taxicab Co., 66 Misc. Rep. 191, 192, 121 N. Y. Supp. 271.

That the first clause of section 5, quoted above, does not pretend to give a lien to the defendant must be obvious when we read the further provision that at the option of the carrier the goods may be "removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage," etc. Here is a contractual provision for a lien, but the lien runs to the warehouseman and not to the defendant; it is a provision for relieving the carrier of all responsibility upon delivering the goods to a public warehouseman, who shall have a lien for the cost to the owner of removing the goods, for the freight and other lawful charges, including a reason-

able charge for storage. There is no suggestion that the defendant has any statutory rights or franchises which would enable it to carry on the business of a warehouseman, and the contract set out in the pleadings does not provide for a lien upon the goods for the storage, so far as section 5 is concerned, and, unless there is some other provision of the contract to help out the defendant's contention, it follows that the judgment cannot be disturbed.

Section 8 of the alleged contract is set forth in the counterclaim, but this does not pretend to give the defendant a lien. It provides that the "owner or consignee shall pay the freight and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery." Concededly the plaintiff had paid the freight upon this shipment from Troy to Covington, and it does not appear that there were any other lawful charges against the property, and the contract, as we have already pointed out, merely provided methods of substituted delivery, of which the defendant might avail itself. It is. not alleged that it delivered the goods to a warehouseman; the only inference to be drawn is that it left the goods in the car in which they were originally shipped; and the defendant's connecting carrier offered them to the consignee under conditions which undoubtedly relieved it of the obligations of a common carrier but which did not, either under the alleged contract or under any provision of law to which our attention is called, operate to give a warehouseman's lien either to the defendant directly or to its connecting carrier. The rule is well established that:

"When goods are safely conveyed to the *place* of destination, and the consignee is dead, absent, or refuses to receive, or is not known and cannot after due efforts are made be found, the carrier may discharge himself from further responsibility by placing the goods in store with some responsible third person in that business, at the place of delivery, for and on account of the owner. When so delivered, the storehouse keeper becomes the bailee and agent of the owner in respect to such goods." Fisk v. Newton, 1 Denio, 43, 47, 43 Am. Dec. 649; North Penn. Railroad v. Commercial Bank, 123 U. S. 727, 734, 8 Sup. Ct. 266, 31 L. Ed. 287.

The contract, as set out in the pleadings, evidently modified this rule, so that the defendant, or its connecting carrier, could set the car apart and store the goods therein, relieved of the responsibilities of a common carrier. When this was done the relations between the plaintiff and defendant, under the terms of the contract so far as we may determine from what is before us, changed. The goods were delivered by the initial carrier (the defendant) to its connecting carrier and by the latter transported to the place of destination, and the consignee was notified and the car was set apart and upon the private switch of the consignee, where it remained for several days before the consignee rejected the goods. After 48 hours from the time that notice was given, the delivery was complete within the contract; the contract of the common carrier was at an end; and the connecting carrier merely held the goods subject to the condition that "the party entitled to receive" the same should be liable for "a reasonable charge for storage and to carrier's responsibility as warehouseman only."

So far as the defendant is concerned, therefore, the goods were in

Covington, Ky., where they were lawfully in the possession of the defendant's connecting carrier as bailee and agent of the owner, the plaintiff in this action; and the plaintiff owed to the Chesapeake & Ohio Railway Company, such connecting carrier, a "reasonable charge for storage," but, so far as appears, without any provision for a lien upon the goods for that amount, as there is nothing to show that the Chesapeake & Ohio Railway Company has any authority to act as a warehouseman, or that there was any intention of giving such corporation a lien upon the plaintiff's goods. Moreover, it is not claimed that the Chesapeake & Ohio Railway Company ever assigned any claim for these charges to the defendant. With the plaintiff's goods in Covington, in the hands of its bailee and agent, the plaintiff sent an order for the return of these goods, and the Chesapeake & Ohio Railway Company, as a common carrier, became the initial carrier. In point of law an entirely new transaction was undertaken, as much as though the railroad company had exercised its option and delivered the goods to a public warehouseman and the latter had, as the bailee and agent of the plaintiff, offered the goods for transportation to the city of Troy, and the only lien which the common carrier could impose upon this shipment was such as grew out of the contract for transportation from Covington to Troy. This lien the plaintiff offered to discharge by tendering the amount of the freight charges, and the defendant, by refusing to deliver the goods, has unquestionably made itself liable for the value of the same, less the amount of freight charges. Whether the Chesapeake & Ohio Railway Company was bound to deliver the goods as bailee and agent of the plaintiff to itself as the initial carrier, it is not necessary to decide here. It did deliver the goods to the defendant as a connecting carrier entirely independent of the original contract under which the plaintiff forwarded the goods to Covington, and the defendant took the consignment into its charge the same as though it were an original shipment. It had no power or authority to make the collection of storage charges in Covington, accruing before the relation of carrier began, a condition of the delivery of the goods to the plaintiff; that was a matter between the party furnishing the storage and the plaintiff; and the fact that the defendant may have paid such charge in the regular course of business did not give it a lien upon the plaintiff's goods for that amount. It is not claimed that it had any such power under any statute, and the contract, as we have seen, does not pretend to give a lien where the carrier, or its connecting carrier, elects to store the goods itself in lieu of a personal delivery to the consignee. The contract provision is a privilege relieving it of its strict common-law obligations as a common carrier, and it cannot be stretched into an agreement for a lien upon the property, although the person for whose benefit the storage is made may be liable for the reasonable charges.

If we are right in this position, and if the plaintiff was entitled to the delivery of its goods upon the payment of the freight charges from Covington to Troy, it follows, of course, that the subsequent claim for demurrage, arising from the failure of the plaintiff to take the goods and pay the demand of the defendant for the $38 storage charges, is without merit and gives the defendant no rights. It might be, of

course, that the defendant, as the assignee of a "reasonable charge for storage," could have interposed such claim as a counterclaim in the present action, but it does not allege any such condition; it stands upon the proposition that it had a right to demand the payment of demurrage charges as a condition of the delivery of the goods, and its claim for the substantial part of its alleged counterclaim is based upon demurrage said to have accrued after the plaintiff had refused to pay the charge of $38 for demurrage while the goods were stored in Covington, and which can have no basis unless the defendant was justified in holding the goods pending the payment of such charge. Demurrage contemplates payment for the use of cars or vessels while being discharged of their freight, and not for their use as warehouses under a contract for a substituted delivery. "Demurrage, in the proper sense of the term," says the American & English Encyclopedia of Law (volume 9, 221), "is an allowance or compensation for the delay or detention of a vessel, expressly provided for in a charter-party or bill of lading"; and the same authority says that under some circumstances the shipper or consignee of goods over a railroad may become liable in damages under an express or implied contract for the detention of cars or other property belonging to the company, and the term "demurrage" is commonly applied to these damages.

In Crommelin v. New York & Harlem R. R. Co., 43* N. Y. 90, the defendant had transported certain marble belonging to the plaintiff and to be delivered to him in New York. The marble arrived at its destination on the 11th day of October, 1860. The defendant proved that prior to this time it had given notice to the plaintiff that his freights must be removed within 48 hours after their arrival or that $1 a day for each car detained would be charged for such detention, and further proved that this was the general custom of the company. It was also proved that written notice was given the plaintiff of the arrival of the marble, calling attention to the demurrage charge which would be demanded for delay. The cars remained upon the track until the 18th of October, when the plaintiff paid the freight and demanded the marble. The defendant refused delivery except upon the payment of $1 per day for each car detained beyond the first 48 hours, and this the plaintiff refused to pay, bringing an action in replevin. The court say:

"The legal question here is: Had the defendants a lien upon the marble for the delay in taking it, which justified their refusal to deliver it. That the defendants had a lien for the freight of the marble is not denied. The plaintiff conceded it and paid the amount before demanding the marble. The lien of an innkeeper or of a common carrier is well established. So the principle is well established generally that every bailee who bestows labor, care, or skill upon an article intrusted to his possession may retain the article until the amount due to him for such care, labor, or skill shall be paid. The watch repairer, the blacksmith, and the tailor are the instances usually cited by way of illustration. On the other hand, A., being stable keeper or an agister of cattle, has no such lien. He must deliver the horses or the cattle to the owner upon demand and seek his remedy upon his contract. * * * The character of a warehouseman, or any liability for its protection or storage, after 48 hours, was expressly disclaimed by the defendants in their notice of October 12th. It was never removed from the cars but remained upon them in the public highway until after the plaintiff had demanded its

delivery to him. The defendants insist that by the goods being left upon their cars, and by the delay of the plaintiff to remove them within 48 hours. after their arrival, injury, inconvenience, and expense was suffered by them. This is quite probable. It constitutes, however, a claim in the nature of demurrage and does not fall within the principles of those transactions, which gives a lien upon the goods. It is a breach of contract simply, for which, as in case of a contract in reference to pilotage or port charges, the party must. seek his redress in the ordinary manner."

The case last above cited does not appear to have been· questioned in the later decisions, and it certainly presents as strong a case for the assertion of a lien as that in the matter now before us, where the contract was clearly for a modification of the common-law obligation of the carrier in respect to the delivery of the goods at Covington; and the defendant having no lawful right to detain the plaintiff's goods, after a tender of the freight, and the claim for reasonable storage charges not having been presented as such by the pleadings, we see no escape from the conclusion that the counterclaim was properly disallowed.

The judgment appealed from should be affirmed, with costs. All concur, SMITH, P. J., in result, except

JOHN M. KELLOGG, J. (dissenting). By the bill of lading under which the defendant at Green Island, N. Y., received the car load of gunny bagging from the plaintiff for shipment to Covington, Ky., the defendant was to deliver it to the connecting carrier on the route to its destination, and it was agreed as to each carrier over any of the routes that, if the property was not taken by the consignee within 48. hours (holidays excepted) after notice of its arrival, it might be stored and the storage charges and freight should be a lien thereon, and that a reasonable charge might be made for use of tracks, or for detention of car, after the car has been held 48 hours (exclusive of holidays) for loading or unloading, which charge is to be added to all other charges thereunder, and the property may be held subject to the lien thereon, and that the freight and all other lawful charges accruing upon the property, if required, shall be paid before delivery.

The car arrived at the Covington yards of the Chesapeake & Ohio. Railway Company March 16th, and notice to the consignee of the arrival was given the 17th, although the car was not actually upon the siding of the consignee ready for unloading until the morning of the 21st. On the 22d the Chesapeake & Ohio Railway Company's. agent told the shipping and receiving clerk of the consignee that he better unload the car and save demurrage. He replied he did not. know whether they would accept it or not. The reply was:

"If you don't, give us notice."

On the 24th the consignee notified the consignor by wire, and confirmed it by letter the following day, that it would not receive the bagging but would return it, and a correspondence ensued; the plaintiff seeking to induce the consignee to accept the property. April 1st formal notice of the rejection of the bagging was given by the consignee to the Chesapeake & Ohio Railway Company, which notice also. stated:

"And will thank you to return same at the expense of the shipper over the same routing as received."

But the consignee had no authority to charge the expense of the return to the plaintiff, and evidently the return would not be made on such a notice. April 20th the plaintiff delivered to defendant an indemnity agreement requesting it to stop the bagging for it before delivery to the consignee and have it returned, in consideration of which it agreed to indemnify defendant and save it harmless from any suit, legal proceedings, loss, damage, expense, counsel fee, costs, and charges arising from or caused by its attempting to comply with the request. It concluded:

"The full meaning and intent of this agreement being that you are to act as agent in this transaction."

Pursuant to that agreement, at defendant's request, the Chesapeake & Ohio Railway Company, on the 18th day of June, shipped the goods over its line and the defendant's line to the plaintiff at Green Island, N. Y., with charges thereon of $38 for demurrage of the car, and required payment thereof before the delivery to the plaintiff. The defendant duly notified the plaintiff of the arrival of the car and that the freight charges were $41.82 and demurrage charges of $38, and asked payment before delivery. The plaintiff offered to pay the freight but refused to pay anything on account of demurrage. In response to the defendant's request that the Chesapeake & Ohio Railway Company permit a delivery of the goods without a payment of the demurrage charges, it notified the defendant that it could not legally authorize the delivery without payment but would recommend to the Car Service Association a refund of that portion which should be refunded, and asked if a delivery could not be effected in that way. This suggestion was communicated to the plaintiff, but it preferred to sell its bagging to the defendant rather than to make this reasonable adjustment and brought this action. If the plaintiff had paid the demurrage, it might have obtained a refund of any excess charges through the Car Service Association or by application to the Interstate Commerce Commission.

The defendant might well have rested its case upon the indemnity agreement. As plaintiff's agent it was justified in accepting a conditional delivery of the property and agreeing that an absolute delivery to the plaintiff should not be given until the $38 demurrage was paid. The plaintiff cannot repudiate the acts of its agent and recover the property or its value without payment of the charges. Independent of that agreement, the defendant was well within its rights in refusing delivery until the demurrage was paid. A common carrier must accept property delivered to it by a connecting carrier in the usual course of business and forward it towards its destination, and must receive it upon the usual terms on which such shipments are made. If charges connected with the transportation follow the property, if required it must collect them before delivery to the consignee. The shipment of the property, the possession by the defendant, and its authority to de-

liver it to the consignee are subject to such condition. The terminal carrier cannot know whether the charges are reasonable or not. It is enough for its protection that the charges purport to be connected with the shipment, and such as in the ordinary course of business might properly exist. It cannot refuse to receive freight because it is not satisfied that the charges against it are in all respects legal. It must accept the freight and continue the transportation with reasonable despatch. Holding the property until it is satisfied that it can safely take its chances as to the validity of each item charged against it, as a condition of delivery, would be unreasonable. Defendant had no choice whether or not it would receive the property subject to the charges stated, and it therefore is not in any manner responsible for their validity and cannot be made liable for a conversion of the bagging by a refusal to deliver before payment of the charges.

If the plaintiff's position is right, the defendant would be liable if it refused to receive the property subject to the collection of the charges, and would be liable if it refused to deliver the property without payment of the charges. We need not therefore inquire whether or not the demurrage charges of $38 were valid in all respects. It was the duty of the defendant to refuse to deliver until payment unless the connecting carrier otherwise directed. A carrier in interstate commerce has a lien for the freight and any charges attending the transportation. Wabash Railroad Co. v. Pearce, 192 U. S. 179, 24 Sup. Ct. 231, 48 L. Ed. 397.

The Chesapeake & Ohio Railroad Company had the right to charge demurrage and hold the freight until payment thereof according to its rules, which were filed with the Interstate Commerce Commission, and it would be illegal for it not to collect proper demurrage as a condition of delivery; it must observe its rules and treat all shippers alike.

The plaintiff knew the bagging was rejected. It also knew that the consignee was not paying the return freight and that it had given no directions which made it liable therefor. It therefore knew that the bagging remained at Covington subject to its order. It elected not to ask a return but was evidently trying to induce the consignee to reconsider its position. Notice by the railway company to it of the rejection would have given it no additional information. It had knowledge of all the facts. Under the circumstances, therefore, a notice by the company was unnecessary and would have been without effect.

The car was not placed for delivery on the siding of the consignee until March 21st, and demurrage should therefore have been computed from the 22d or 23d. The evidence indicates that it was computed from the 18th. It is clear that the railroad company was entitled to charge demurrage. Apparently the charge is about $4 or $5 too much. But the plaintiff will not lose the money if it pays the charge. A tribunal exists which will informally hear its complaint and grant relief.

The defendant has acted strictly within its rights and no cause of action has been shown. The plaintiff, by refusing to receive the freight after due notice, according to the defendant's rules on file with the Interstate Commerce Commission, is liable for demurrage at

Green Island. The defendant has established its counterclaim and is entitled to judgment thereon.

The judgment should therefore be reversed, with costs, and the defendant should have judgment for its counterclaim, with interest, and costs at the trial term.

LYON, J., concurs in the dissent.