HORTON v. TONOPAH & GOLDFIELD R. CO.

(District Court, D. Nevada. October 6, 1914.)

No. 1125.

1. CARRIERS ⬠197—CONVERSION BY CARRIER—UNCLAIMED FREIGHT.

Where the carrier has sold lumber shipped for freight and demurrage charges, after due notice and demand, and in strict compliance with the statute relating to the sale of unclaimed freight, there is no conversion.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 891–900; Dec. Dig. ⬠197.]

2. CARRIERS ⬠100—CARRIAGE OF FREIGHT—DEMURRAGE.

Where the rules of a car service association, regularly filed with the Interstate Commerce Commission, prohibited agents from storing car load freight in warehouses or on ground belonging to the railroad company without adding car service charges, the same as if the freight had been left in the car, the carrier's right to collect demurrage does not end when the shipment is unloaded, so that the car may be released for service, the rule being obligatory upon the carrier, and violations thereof constituting unlawful discriminations.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 427–433; Dec. Dig. ⬠100.]

3. CARRIERS ⬠197—CARRIAGE OF FREIGHT—SALE OF FREIGHT FOR CHARGES.

Under Rev. Laws Nev. § 541, providing that uncalled for freight may be sold for charges, upon notice, in an action by the shipper for conversion of a shipment of lumber which had been sold to pay freight and demurrage, the burden was on the carrier to show that the sale was regularly conducted.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 891–900; Dec. Dig. ⬠197.]

4. CARRIERS ⬠197—CONVERSION BY CARRIER—SALE OF UNCLAIMED FREIGHT.

Where a carrier sold certain car load lots of lumber, title to which was in plaintiff as consignor, but which consignee had refused to accept, for freight and demurrage charges, in one parcel, together with shipments belonging to others, to a purchaser who secretly acted as agent for the carrier, which was the real purchaser, it was a conversion of the lumber.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 891–900; Dec. Dig. ⬠197.]

5. CARRIERS ⬠100—CARRIAGE OF FREIGHT—CONTRACT OF SHIPMENT—DEMURRAGE—INCREASED RATES.

While changes in freight rates will not be given a retroactive effect, as to the contract of shipment, when the shipment has reached destination, and after the expiration of the free time allowed under the schedules filed with the Interstate Commerce Commission, demurrage rates may be advanced and collected after such time without being objectionable as

⬠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

affecting pre-existing rights, since the shipper has no right under the contract of shipment to occupy the carrier's premises for storage purposes.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 427–433; Dec. Dig. ☞100.]

6. CONSTITUTIONAL LAW ☞188—RETROACTIVE EFFECT OF RULES—CARRIAGE OF FREIGHT—RATES.

A rule of the Interstate Commerce Commission regulating freight rates and charges cannot be regarded as retroactive, unless it impairs some right vested according to existing law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 530; Dec. Dig. ☞188.]

At Law. Action by C. E. Horton, surviving partner of the firm of the Horton-Hinckley Lumber Company against the Tonopah & Goldfield Railroad Company. Judgment for plaintiff.

John T. Thornton and Leo C. Lennon, both of San Francisco, Cal., for plaintiff.

Hugh H. Brown and J. H. Evans, both of Tonopah, Nev., for defendant.

FARRINGTON, District Judge. The plaintiff, C. E. Horton, surviving member of the firm of Horton-Hinckley Lumber Company, in this action seeks to recover for the alleged conversion of some 22 car loads of lumber.

The defendant company owns and operates a line of railroad, reaching from Mina to Tonopah and Goldfield, all in this state. The lumber in question was shipped in 1907 from points outside the state, received by the defendant at Mina, and transported, 18 car loads to Goldfield, and four car loads to Tonopah. In each case the consignment was to Horton-Hinckley Company itself, but with the understanding between Horton-Hinckley Company and its customers that each lot should be delivered to the party ordering it when he paid the freight, and until such payment was made legal title to the lumber would remain in the consignor. On arriving at its destination the lumber was refused by the parties ordering it. Horton-Hinckley Company was notified of this fact, but failed to take any action. In August, 1907, Hinckley went to Tonopah and Goldfield, and later the firm wrote defendant that the entire situation would be cleaned up in 10 days, but nothing was done.

[1] The company was fully and seasonably informed as to the arrival of the lumber at its destination, and the failure of the persons by whom it was ordered to take and receive it. Frequent demands were made by the railroad company for the payment of its charges, and the removal of the lumber. The four car-loads sent to Tonopah were sold at public auction December 9, 1907, for $1,435.04. This sale appears to have been entirely regular, and in strict compliance with the Nevada statute regulating the sale of unclaimed freight; consequently the lumber cannot be regarded as having been converted by the defendant.

Under the Revised Rules and Regulations of the Utah Car Service Association, in force at Tonopah during the times in question, it was

the duty of defendant to collect for car service and storage the sum of $1 per car per day after the expiration of 48 hours' free time. Under these rules the free time did not commence until the car had been properly placed for unloading and delivery. In computing the time all Sundays and holidays are excluded.

Two hundred and seven dollars, the amount claimed as demurrage on the lumber shipped to Tonopah, is not excessive, and is therefore allowed and found to be due from plaintiff; and it is conceded that $1,228.73 is due for freight.

The 18 cars sent to Goldfield contained 314,728 feet of lumber. They reached that point as their final destination at various times between April 1 and August 12, 1907. The freight charges claimed are $6,131.50. This amount is conceded to be correct, and is therefore found to be the amount due.

Six cars were unloaded in June, 1907, and the remainder in October of the same year. This was done by defendant company. Defendant's cars were then released, but the lumber remained on its right of way.

[2] Plaintiff contends that the company's right to collect demurrage ended when the cars were thus released for service. I am unable to accept his view. Rule 11 of the Car Service Association, in force at that time, prohibited agents—

"from storing any part of car load freight in warehouse or on ground belonging to the railroad company without adding thereto car service charges, the same as if the freight had been left in the car."

This rule was stated in defendant's tariff schedule, regularly filed with the Interstate Commerce Commission, and published as required by law; consequently it was so obligatory that until changed by action of the Commission itself, it was unlawful for the carrier to collect or receive any greater or less compensation for storage than that provided for in the rule. Furthermore, to permit the carrier to stop the running of demurrage charges by unloading freight cars for favored patrons would render the collection of such charges more or less discretionary, and open the door for discrimination as between shippers, the very thing which the act to regulate commerce was designed to prevent.

November 5, 1907, the lumber was offered for sale by the company at public auction, under the provisions of the Nevada act providing for the sale of unclaimed freight. There being few or no bidders, it appears to have been bid in by the company itself, and immediately thereafter the company began to sell the lumber in small lots at private sale. During the month of November three car loads were purchased by the Goldfield Lumber Company. Being advised that these proceedings were irregular, defendant company caused the remaining 15 car loads to be again advertised for sale.

[3] Section 541 of the Revised Laws of Nevada, under which these sales were attempted to be made, provides:

"If no person calls for the freight or other property received by such railroad, express company or other common carrier, commission, forwarding merchant, or warehouseman, within sixty days from the receipt thereof, the carrier, forwarding, commission merchant, or warehouseman may sell such prop-

erty, or so much thereof, at auction to the highest bidders, as will pay freight and other just and reasonable charges, first having given notice of the time and place of sale to the owner, consignee, or consignor, when known, and by advertisement in a daily paper ten days, or if a weekly paper, four weeks, published where such sale is to take place, or if there is no paper published at the place where such sale is to take place, by posting a notice of the sale conspicuously in at least three public places."

No valid sale of undelivered freight can be made by a carrier unless the statutory method is strictly pursued. 2 Moore on Carriers, p. 649.

The burden is on the carrier to show that one or the other of these sales was regularly conducted. This has not been done. Furthermore, the evidence fails to show that any notice of the time an place of sale was first given "to the owner, consignee, or consignor."

[4] At the second sale the 15 car loads of lumber in question, belonging to Horton-Hinckley Company, together with 4 car loads of coal belonging to the Goldfield Trading & Transfer Company, and 13 car loads of lumber belonging to various other persons and firms—32 car loads in all—were sold in one parcel to H. W. Brooks for $2,000. It appears that Brooks at some previous time had been an employé of the company, and was a brother of one S. W. Brooks, defendant's then agent at Goldfield. The purchase was made in pursuance of a secret understanding that Brooks was merely acting as agent for the company, that the company was the real purchaser and party in interest. Brooks paid nothing for the lumber, but proceeded to dispose of it at retail, turning the proceeds in to the company. These proceeds were credited to the Horton-Hinckley Company account. The Railroad Company itself, as the evidence shows, used a considerable quantity of the lumber, which was credited to the same account, at $25 per thousand.

It is very clear that these transactions constituted a wrongful conversion of the lumber. Gulf, C. & S. F. Ry. Co. v North Texas Grain Co., 32 Tex. Civ. App. 93, 74 S. W. 567; Van Zile on Bailments and Carriers, §§ 126, 305, 542. Martin v. McLaughlin, 9 Colo. 153, 158, 10 Pac. 806.

I find that the 18 car loads so converted contained 314,728 feet of lumber, of the value of $40 per thousand, or a total value of $12,589.12, at the time and place of conversion.

The date of the conversion is fixed as November 5, 1907, the time of the first attempted sale.

Central Ry. Co. v. Chicago, etc., Co., 122 Ga. 11, 49 S. E. 727, 106 Am. St. Rep. 87.

[5] The amount of demurrage charge presents the most difficult question in the present case. The oldest waybill is dated January 31st, and the most recent August 24, 1907. According to the testimony, between the 1st day of February and the 19th day of July, 1907, the charge at Goldfield was $1 per car per day; between July 19th and October 19th of the same year, it was $3 per day; and between October 19, 1907, and January 17, 1908, it was $10 per day. Under the rule in force, the demurrage began to run on each car at the expiration of 48 hours after it had arrived at its destination, and had been placed in a suitable position for unloading and delivery. The time is computed

by excluding Sundays, holidays, and each Monday immediately following a Sunday which is itself a holiday. These advances in demurrage rates were provided for in schedules regularly filed from time to time with the Interstate Commerce Commission, and posted and published in conformity with the federal statute.

Defendant contends that each advance in rates must be given effect, and be enforced on each car load of lumber remaining in the custody of the company after the expiration of free time, even though the advance was not made until a date subsequent to the day when the car left its point of origin. Plaintiff contends that such a course gives the rules and rates a retroactive effect. He maintains that the demurrage rates in force when the through movement began must control throughout, and can neither be increased nor diminished pending the particular shipment, either by the carrier or the Interstate Commerce Commission. Apparently this question has never been passed on. The Interstate Commerce Commission has held a number of times that changes in freight rates will not be given a retroactive effect. For instance, if a certain lot of merchandise is shipped from New York City to Salt Lake, it must pass over a number of independent connecting lines; it is, however, a through route, for which a through rate is given in the tariff schedules in force at the time the movement begins. This through rate must control the particular shipment until it reaches its destination. It is regarded as a contract between shipper and carrier. If, while the goods are in transit, and before they reach Chicago, the local rate between Omaha and Salt Lake is raised or lowered, the change cannot affect this particular shipment. Any other rule would be disastrous. A merchant doing business in distant localities is entitled to know before he ships his goods what the freight charges will be. With this information he can decide whether to make the shipment or not. If it were permissible to change the rate on such a consignment after the shipper had parted with his possession, a serious and wholly unnecessary element of uncertainty and hazard would be introduced into business. Through Routes and Through Rates, 12 Interst. Com. Com'n R. 163, 170; Barnes on Interstate Transportation, p. 234; New Orleans Storage Rules & Regulations, 28 Interst. Com. Com'n R. 605–607.

After the lumber in question reached Goldfield and a reasonable opportunity had been afforded to remove it, defendant's duty as a carrier was fully performed. If the consignee then failed to receive or remove the lumber, the railroad was bound to exercise reasonable care for its safety and preservation until it could be legally sold in satisfaction of accrued charges. The carrier, however, is under duties other than those which it owes to the particular shipper. It owes a duty to the community, which cannot be efficiently and properly performed if its cars and terminal facilities are cluttered with uncalled for freight. This fact is important in fixing terminal rates. The rate must be large enough to yield reasonable compensation for the service rendered—for the use of cars, tracks and storage space—but to this must be added an amount sufficient to stimulate, and even coerce, the speedy removal of freight after the carriage is complete.

Hence a demurrage charge has been held to be in part compensation and in part penalty to secure the release of equipment and tracks.

In re Advances in Demurrage Charges, 25 Interst. Com. Com'n R. 315.

The reasonable demurrage charge, therefore, may be utterly unreasonable, if measured only by the value of the service to the particular shipper. However, all questions as to the reasonableness of the demurrage charges in the present case are settled by the action of the Interstate Commerce Commission, and are not subject to inquiry in this court.

Unquestionably the schedule of transportation rates filed with the Interstate Commerce Commission, posted and published in conformity with the statute, together with the waybill and the fact that the lumber was shipped, constitute a contract. It is an agreement to perform a certain amount of service for a definite compensation. Any change therein after the transportation begins, without the consent of both parties, would be unjust. With respect to such contracts the Interstate Commerce Commission has repeatedly said that changes in the schedule of rates will not be permitted to retroact on freight movements commenced before the change was made.

The contract was entire and indivisible, so much so that, if through any act of the shipper the shipment was not completed, the carrier was entitled to his full charges (6 Cyc. 493); and by issuing the bill of lading the carrier binds itself to deliver the goods at their destination. 6 Cyc. 481.

This agreement is essentially and radically different from the arrangement as to the lumber left in defendant's custody after the expiration of 48 hours' free time. True, the schedules in force when the original movement began fixed a demurrage rate at $1 per car per day, and this rate could not be withdrawn or modified except by consent of the Commission, obtained in the manner provided by law. Nevertheless, there was no agreement that the lumber, or any portion thereof, after it arrived at its destination, should remain in the custody of the railroad company for any fixed period, or, in fact, for any period whatever beyond a reasonable time for delivery. The schedule was in the nature of an offer to store goods at a certain rate. Until the offer is accepted in some way, there is no binding contract. If the fact that the 18 cars were left in the custody of the company after the expiration of the free time for unloading be construed as an acceptance of the demurrage rates set out in the schedules, still it was not an acceptance for any definite period.

In T. M. Kehoe & Co. v. Charleston & Western Ry. Co., 11 Interst. Com. Com'n R. 169, it is said that:

"A railroad company is a common carrier. Its duty is to transport freight to destination and to deliver it to the consignee. It is the duty of the consignee to receive his freight within a reasonable time, and if he neglects to do so the liability of the railroad company as a common carrier ceases, and it becomes simply a warehouseman. It is under no legal liability to continue to discharge the duty of a warehouseman, but may insist that the consignee shall receive and remove his freight. The consequences to the railway of neglect to do this are not merely, in case of car load freight, the loss of the use of a car. The uncertainty arising from the fact that cars are sometimes

unloaded promptly and sometimes not is embarrassing. The congestion of its terminals is often and perhaps usually a more serious matter than the loss of its cars. It would be not only much more expensive, but often impossible, for the railways of this country to handle their traffic at many points unless they required the prompt removal of the freight from the car. To permit one person to use the cars of a railroad company for a storehouse and to deny that privilege to another creates a discrimination between shippers which is often serious."

Again in Wilson Produce Co. v. Pennsylvania R. Co., at page 122, vol. 16, Interst. Com. Com'n R. it is said:

"There is no law which requires a railroad to give its cars and tracks under any terms for use as warehouses. * *₁ * The * * * road is entitled to have its equipment and tracks freed within a reasonable time, and it may impose charges which will lead to such release as speedily as possible."

In a report on demurrage charges, 25 Interst. Com. Com'n R. 315, the Commission quotes with approval its previous statement that:

"The railroad is under no legal liability to continue to discharge the duty of warehouseman, but may insist that the freight shall be removed by the consignee."

It has frequently been held by the courts that after goods have arrived at their destination, and a reasonable time for delivery has elapsed—

"the carrier may place the goods in a warehouse, or store them with a responsible person, to be kept on account of or at the expense of the owner. Troy Waste Mfg. Co. v. N. Y. Cent., etc., R. R. Co., 158 App. Div. 352, 143 N. Y. Supp. 420, 425; N. Y. Hay Exchange Asso. v. P. R. R. Co., 14 Interst. Com. Com'n R. 178, 185; North Pa. R. R. Co. v. Commercial Bank, 123 U. S. 727, 734, 8 Sup. Ct. 266, 31 L. Ed. 287; 1 Moore on Carriers, p. 259.

It is difficult to understand how plaintiff, as against the railroad company, had acquired any right to insist upon having the lumber stored on the company's right of way or in its cars for any period beyond a reasonable time for unloading. If this be so, it follows that no change in the rate of demurrage made in accordance with the provisions of the congressional act, after the shipment of the lumber to Nevada was commenced, can be regarded as operating retrospectively. Such a change does not impair or affect any pre-existing rights or obligations.

[6] A rule cannot be regarded as retroactive unless it impairs some right vested according to existing law—unless it operates on obligations existing before it was enacted. 26 Ency. of Law, 692.

The withdrawal or modification of an offer does not affect any existing right, provided the withdrawal or modification takes place before the offer is accepted. The same may be said of the advance in demurrage rates made after the lumber arrived in Goldfield, because there was no contract or legal liability to devote cars and terminal facilities to the storage of lumber, beyond a reasonable time for unloading. The carrier was at liberty to store the lumber with some responsible person, or to store it on its own right of way, in which event it was bound to collect the same rate of demurrage as though the lumber remained on the cars, or, it might do what it evidently did do, apply to the Interstate Commerce Commission for an advance in the rates, in order to coerce a removal of freight. Horton-Hinckley Company was seasonably

advised of the increase; hence it was within its power, by paying the accrued charges and removing the lumber, to avoid paying any demurrage which was deemed excessive or unreasonable, or, in fact, to avoid paying any demurrage whatever.

I find the demurrage on the 18 cars to be $4,909. This sum is made up as follows: 1,244 days at $3.00 per day; 72 days at $10 per day; and 457 days at $1 per day. The account will then stand thus:

Proceeds from sale of four car loads of lumber shipped
  to Tonopah......................................$ 1,435 04
Value of 314,728 feet of lumber sent to Goldfield at $40
  per M......................................... 12,589 12
                                      $14,024 16

Total freight charges on 22 cars....................$ 7,360 23
Demurrage on four Tonopah cars..................... 207 00
Demurrage on 18 Goldfield cars..................... 4,909 00

    Total charges................................ $12,476 23

      Amount due plaintiff................................$ 1,547 93

In view of all the testimony, I am unable to award any exemplary damages.

Let a judgment be entered in favor of plaintiff for the sum of $1,-547.93, with interest thereon at the rate of 7 per cent. per annum from the 5th day of November, 1907.