### HITE et al. v. CENTRAL R. OF NEW JERSEY.

(Circuit Court of Appeals, Third Circuit. June 7, 1909.)

No. 42.

1. COMMERCE (§ 89*)—INTERSTATE TRANSPORTATION—CONSTRUCTION OF SCHEDULES—JURISDICTION OF COURTS.

A Circuit Court of the United States has jurisdiction to determine in the first instance the indebtedness of a shipper to a railroad company for demurrage, under the rules adopted by the company and filed with the Interstate Commerce Commission, where it depends on the construction, and not on the reasonableness or unreasonableness, of such rules, although the latter question is one primarily for the Commission.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*

Jurisdiction of federal courts of suits under interstate commerce act, see note to Bailey v. Mosher, 11 C. C. A. 313.]

2. CARRIERS (§ 100*)—DEMURRAGE—CONSTRUCTION OF RULES—"DATE OF ARRIVAL"—"DATE RELEASED."

A coal company contracted with a railroad company for the carriage of coal from the mines to tide water at Elizabethport, N. J., where the coal was loaded upon vessels. When cars arrived in Elizabethport they were placed in the railroad company's general yards until a vessel of the shipper was ready to load, when it registered at the railroad company's pier, and such company berthed it, and ran the cars out on the pier, and dumped the coal into the vessel as an incidental part of the transportation. Sometimes there was delay waiting for a vessel or a berth. The schedule of rules respecting charges filed by the railroad company with the Interstate Commerce Commission required the payment of demurrage when there was an average detention of cars for more than five days, computed on the basis of the time "between the date of arrival of each car and date released." *Held*, that the "date of arrival" meant the time of the arrival of the car in the yards, and not upon the pier, nor the time when notice of arrival was given the shipper's agent, and that the "date released" did not mean the date when the car was unloaded, but the date when the shipper's vessel was registered at the pier as ready to load; the car being then released so far as the shipper was concerned, and any further delay being that of the railroad company.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 100.*]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

See, also, 166 Fed. 976.

Wm. A. Glasgow, Jr., for plaintiffs in error.

A. M. Beitler, for defendant in error.

Before GRAY and BUFFINGTON, Circuit Judges, and YOUNG, District Judge.

GRAY, Circuit Judge. The plaintiffs in error were shippers of coal from the bituminous coal region of West Virginia to tide water in New York Harbor. The shipments were made over the Central Railroad Company of New Jersey, which company received the coal from a connecting railroad and transported the same to its destination at Elizabethport, N. J. On the 10th of August, 1906, the plaintiffs in error entered into a written agreement, with surety, with the Central Railroad Company of New Jersey, the defendant in error, for the punctual pay-

ment of all moneys then or thereafter to become due from the plaintiffs in error, for tolls, freight and charges on coal or coke passing over the railroads and canals operated by the said defendant in error, and providing for a lien upon such coal or coke in the possession of the said defendant in error, for all sums due and unpaid on account of such freight, tolls, and charges. Attached to said agreement was a power of attorney, authorizing any attorney of a court of record, upon filing a copy of said agreement, accompanied by an affidavit of an officer or agent of the defendant in error, of the amount due under the said agreement, to sign a stipulation for entering an amicable action, and to confess judgment thereon against the plaintiffs in error for such amount, with the usual release of errors, waiver of exemption and stay of execution. On October 28, 1907, such an amicable action in assumpsit was entered in the court below, pursuant to said agreement, and judgment confessed thereon for the amount stated in the accompanying affidavit of the general auditor of the defendant in error, to wit, $3,291, with interest on the same from different dates, as to different portions thereof. On the 6th of November, 1907, there was entered upon the record of said judgment an acknowledgment by the plaintiff of the receipt from the defendants of the sum of $1,932, and that the judgment was thereby reduced by that amount.

On the said 6th of November the plaintiffs in error, as defendants below, presented to the court an affidavit, wherein it was stated that before the confession of the judgment in said case, there had been, and still was, a controversy between the parties thereto, as to the amount of demurrage charges due by defendant to plaintiff; that defendants, upon examination of the statements of claim presented by the plaintiff for their demurrage charges, had agreed that the sum of $1,932 was due to the plaintiff, as being proper charges for demurrage, but had contended and still contend that the balance of the demurrage charges were unjust and contrary to the rules and schedules of the plaintiff, and therefore contrary to the agreement between the parties; that the defendants had offered to pay to the plaintiffs the said sum of $1,932 in full settlement of the demurrage charges claimed by the plaintiff, but that the plaintiff refused to receive the same in full settlement, and thereupon entered its judgment in pursuance of the said agreement made between plaintiffs and defendants on the 10th of August, 1906; that after entry of the said judgment, the payment by the plaintiff of the said $1,932 was made, and acknowledgment thereof noted on the record of said judgment, and that the balance of said judgment of $1,359 is composed of claims for demurrage made by the plaintiff, which the defendants contend are illegal and contrary to the agreement between plaintiff and defendant. The grounds upon which this charge for demurrage is claimed to be illegal, are then stated in the affidavit, in detail, and, so far as pertinent, will appear hereafter in the discussion of the assignments of error filed by the defendants below. After the statement of the facts and circumstances constituting these grounds, the defendants prayed for a rule to show cause why the judgment entered in the said case, as to the sum of $1,359, together with interest as claimed, should not be opened and the defendants let into a defense. The rule to show cause was granted by the court

below, and an answer filed thereto by the plaintiff. An order to take depositions upon the rule to open judgment was also granted, and upon the return of the same, and after consideration thereof, the rule was discharged. To the order and judgment discharging the said rule, a writ of error was sued out by the defendants, and the record, with the assignments of error thereto, is brought before this court for review.

The questions raised by these assignments are two, and both relate to the proper interpretation of certain rules of the railroad company, the defendant in error, for ascertaining the demurrage charges incurred by the shippers of coal, in respect to the detention of cars after arrival at their destination. Prior to the shipments in question, the defendant in error had filed with the Interstate Commerce Commission the following schedule of rules concerning demurrage charges on anthracite and bituminous coal and coke that might be held for transshipment at Port Liberty, Elizabethport, and several other places on New York Harbor in the state of New Jersey, and it is admitted that, subject to these rules, the shipments in question were made:

"Rule 1. On and after May 1, 1907, all cars of coal and coke held for trans-shipment by water more than five days per car, upon the average computed by the month, and exclusive of Sundays and legal holidays, shall be subject to demurrage, representing service of cars, at the rate of $1 per car per day after said five days. (See rule 3.)

"Rule 2. Statements of these charges shall be made up monthly, and shall include only cars that are released during the month covered by such statements.

"Rule 3. In computing time of detention, first ascertain the total number of days between the date of arrival of each car, and date released, from which total deduct the number of Sundays and holidays intervening. From the total figures obtained in this manner for all cars handled for a consignee during the month shall be deducted the product of the number of such cars multiplied by five, the remainder, if any, being the number of days per car for which demurrage will be charged.

"Rule 4. When lading is reconsigned, or sold on track at destination, demurrage charges shall be applied as per rule 1, and the days of detention of any car shall follow that car and be charged to the account of the new consignee. In no event shall more than a total of five days free time be allowed on any car.

"Rule 5. Demurrage charges will be collected either from the consignor or consignee, as are the transportation charges, and all charges must be paid or guaranteed before cars are unloaded."

We agree with the court below, that the present dispute has to do solely with the construction of these rules—especially with the meaning of the phrases, "date of arrival" and "date released," in rule 3, and that the Circuit Court had authority to determine this construction in the first instance. It is true that, under the decision of the Supreme Court, in Texas Pacific Railway v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, the reasonableness of a rate or charge cannot be inquired into in an independent suit by court and jury, prior to action by the Interstate Commerce Commission, finding the established charge to be unreasonable. In the case before us, however, the court is asked to say, as a matter of law, what the schedule of rules in regard to charges for demurrage, filed by the defendant company, ac-

tually is, without regard to the reasonableness or unreasonableness thereof.

The contention of the plaintiff in error is, that, inasmuch as it is admitted that by the contract of carriage of the coal in question from the mines to tide water at Elizabethport, N. J., the defendant in error was bound to move the cars from its yard at Elizabethport onto the pier, and discharge the coal therefrom into the vessels provided by the plaintiff in error, the destination of each shipment of coal was the pier at Elizabethport, and not the adjoining railroad yards. From this admission, it is argued that, in computing the time of detention between the "date of arrival of each car and date released," under rule 3 of the filed schedule, the word "arrival" means the arrival of the car upon the pier, and not arrival in a general sense at Elizabethport, or in the yards of the defendant company.

It appears from the testimony, and it is not controverted, that the universal custom and practice in the conduct of this traffic was, that upon the arrival at Elizabethport of a shipment of coal from any shipper or consignor, the cars containing the same were placed in the yard of the defendant company, within convenient reach of its pier in the harbor, and that when notice was received by the company's agent, that the vessel provided by the consignor was ready to receive its cargo, said vessel was placed alongside the pier and the cars of coal were shunted thereon by the defendant and the coal dumped into the hold of such vessel. It sometimes happened that, upon the arrival of a shipper's coal at Elizabethport, his vessel had not arrived, or was not yet ready to receive the same. Or, it might happen that, though the vessel was at hand and ready to receive its cargo, there was no convenient berth or place alongside the pier to which such vessel could be moved, owing to the congestion of business and the occupation of such berths by other vessels. It appears that for such reasons as these, five free days were allowed by the rules, before the expiration of which no demurrage could be charged.

No bill of affreightment or of lading is exhibited in the record, and the precise wording of the contract of carriage is therefore not in evidence. It seems to be admitted, however, that the contract was generally for transportation of the coal from the mines to tide water at Elizabethport. We understand, therefore, that the word "arrival," as used in rule 3, refers to actual arrival at the company's yards, from which place they were to be shunted onto the pier for the purpose of dumping the coal from the cars into the vessel. Though the duty of the company was not fully performed until the cars had been moved onto the pier and dumped, the transportation from the mines to tide water, or to Elizabethport was accomplished upon the arrival of the cars at the company's yards, the usual place for their detention until a vessel was ready at the pier to receive the coal. The necessary movement onto the pier for dumping coal was a mere incident to the transportation and arrival of the car. The arrival of a car of goods at its destination is one thing; the delivery of the goods into the hands of the consignee is another and different thing. We think, therefore, that the words. "date of arrival of each car," in rule 3, necessarily means the date of arrival at Elizabethport, in the yards of the company, where it

is detained until the vessel of the shipper is ready to receive the coal contained therein.

Counsel for plaintiff in error further contend that, conceding that the word "arrival," as used in rule 3, means arrival in the yards of the defendant at Elizabethport, the date of such arrival, as the basis of the computation of demurrage charges, must mean the date upon which notice of such arrival is received by the shipper from the defendant—that at the date of the reception of such notice, there is what is called a "constructive arrival." As said by counsel for the defendant in error:

"No averment was made or evidence offered to prove that this postal card notice had not been mailed by the railroad company immediately upon the arrival of the cars in the yard, but complaint is made that the postal card did not reach the office of the plaintiff in error until the next day, or possibly several days thereafter, and in some cases never reached there at all."

But aside from this deficiency of proof, it is sufficient to say that there is nothing in the plain language of rule 3, which justifies such an implication of "constructive arrival." To say that such constructive arrival would be a convenient and reasonable qualification of the rule, cannot be considered by a court whose sole function is to construe the rule and extract its meaning from the language employed. To adopt the plaintiff in error's contention, would be to read into the rule a most important qualification thereof, and one which could hardly have failed to have been stated in express language, if such had been the purpose of the defendant in framing its schedule.

The remaining question is raised by the second assignment of error, and is as to the proper meaning of the word "released," in connection with the word "date," as used in the rule referred to, which we again quote in part:

"Rule 3. In computing time of detention, first ascertain the total number of days between the date of arrival of each car, and date released, from which total deduct the number of Sundays and holidays intervening."

The learned judge of the court below has found that the words, "date released," mean the day when the car is actually unloaded, and "the car becomes again available for transportation, when it is relieved from one service and is free to enter upon another." Counsel for plaintiff in error, on the other hand, insist that these words mean that the car is released from and after the time the consignee of the coal has tendered to the railroad company a boat, duly registered at its office on the piers, and has ordered the coal dumped into the vessel.

It is admitted that when a vessel of a consignee was in the port and ready to receive coal, he or his agent, or the master of the vessel, registered that notice at the office of the railroad company on the pier. It was then the duty of the company, as soon as a berth alongside the pier was available, to move the vessel into the same, and transport the cars to the pier side and dump the coal from them into the hold of such vessel. It is true that, in a certain sense, the cars are released when the coal is so dumped, as they then become available for other service, but the word "released" is not the most appropriate word to express this situation. The language would be more apt if we said, "when the car was discharged of its coal or relieved of its coal." "To

release" is a transitive verb. In connotes an actor, a releasor. The moving of the coal cars out onto the pier and dumping the coal into the hold of the vessel, is the act, as it is the duty, of the railroad company. To confine the word "released" to such dumping of the coal by the railroad company, would make the company both the releasor and the releasee, and would put it in the power of the company to extend, at the expense of the shipper, the period of demurrage, at its own will or for its own convenience, by delaying the moving of the cars onto the pier and the discharging of the coal therefrom. The only participation of the shipper in the whole transaction is to notify the company that the vessel is ready to receive the coal, and by such notice, and registering the same in accordance with the requirements of the company, he releases the cars designated from detention on his, the shipper's account, at the yards or pier of the railroad company. The shipper has released the railroad company from the duty or obligation of holding the coal in the cars, to await the convenience of the shipper or the arrival of a vessel. If the word "released" means unloaded, as contended for by the plaintiff in error, we naturally inquire why the word "unloaded" was not used in the third rule. No sufficient answer to this question has been suggested. It seems also apparent that, inasmuch as the subject-matter of rule 1 for demurrage charges is therein stated to be "cars of coal and coke held for transshipment by water more than five days," cars which the consignee has directed to be loaded on a boat (then furnished) could not be aptly described as cars "held for transshipment by water more than five days." They are not cars held for transshipment, but cars released. We think, therefore, that the words "date released," as used in rule 3 of the schedule filed with the Interstate Commerce Commission, refers to the time at which the shipper notifies the company that his vessel is ready to receive the coal from the cars, thereby releasing it from the duty of longer holding them on its tracks for the convenience of the shipper.

It is ordered, therefore, that the order of the court below, discharging the rule aforesaid, be reversed, and the case be remanded with directions for such further proceedings as may be in conformity with this opinion.