CHESAPEAKE & OHIO COAL & COKE CO. v. TOLEDO & O. C. RY. CO.

(Circuit Court of Appeals, Fourth Circuit. July 5, 1917.)

No. 1519.

1. CARRIERS ⬤⟾30—CAR DEMURRAGE—APPLICABLE TARIFF.

A local tariff of demurrage charges applies after it has gone into effect, by notice for the required time, to all cars, including those accepted for transportation before the tariff was issued and filed with the Interstate Commerce Commission; the optional allowance of storage at destination being wholly disconnected with the service of transportation.

2. COMMERCE ⬤⟾89—INTERSTATE COMMERCE—DEMURRAGE CHARGES—COMPLAINT TO COMMISSIONER.

The Interstate Commerce Commission, and not the court, is the tribunal to which complaint should be made of any unreasonableness in a local tariff of demurrage charges filed with it.

3. CARRIERS ⬤⟾100(1)—CAR DEMURRAGE—NOTICE OF ARRIVAL.

In the absence of anything in a tariff of demurrage charges, or the statute under which it is issued requiring the carrier to give notice of arrival of cars, absence of such notice does not affect time when demurrage charges commence, notwithstanding notices are usually given on the day of arrival, as matter of courtesy or custom.

Smith, J., dissenting.

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

---

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action at law by the Toledo & Ohio Central Railway Company against the Chesapeake & Ohio Coal & Coke Company. Judgment for plaintiff (238 Fed. 629), and defendant brings error. Affirmed.

Buckner Clay, of Charleston, W. Va., for plaintiff in error.

E. W. Knight, of Charleston, W. Va. (Brown, Jackson & Knight, of Charleston, W. Va., and Frank S. Lewis, of Toledo, Ohio, on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges, and SMITH, District Judge.

KNAPP, Circuit Judge. The facts are stated in a signed stipulation from which it appears that on July 12, 1909, the above-named railway company, plaintiff below, issued and filed with the Interstate Commerce Commission a "local tariff," effective August 15, 1909, I. C. C. No. 1668, described in the record as Exhibit A, naming "car demurrage rules and charges applying on coal or coke transferred from cars to vessels and reshipped via Lake." On April 4, 1911, the plaintiff issued and filed another local tariff, effective May 15, 1911, I. C. C. No. 1856, described as Exhibit B, bearing the same title, and also the notation, "I. C. C. No. 1856 cancels I. C. C. No. 1668." The "rules and charges" in both tariffs are substantially the same. The stipulation further recites:

"That during the period from May 15th to June 30th, inclusive, 1911, demurrage accrued upon cars of lake cargo coal consigned to defendant and held for it on plaintiff's yards at Toledo, Ohio, after deducting from the debit demurrage days the credit demurrage days to which defendant was entitled under the tariff, to an amount of $10,562.00, unless, as defendant claims, the deductions hereinafter set out should be made therefrom.

"Defendant claims deductions because certain of the cars in controversy in the period last aforesaid were shipped from mines on the Kanawha & Michigan Railway in West Virginia, while plaintiff's tariff Exhibit A was in force, before plaintiff's tariff, Exhibit B above mentioned, was issued and filed as aforesaid, and before defendant had actual notice of the issuing and filing of said last-mentioned tariff, and because certain other cars in controversy in said period were shipped from the mines in West Virginia after said last-mentioned tariff was issued and filed, and after defendant had notice thereof, but before said tariff became effective. Plaintiff denies that the defendant is entitled to any credit or set-off for such reason, or that such defense can be made in this action."

[1] This discloses the main contention. Defendant asserts that the tariff of 1909, imposing demurrage from the 15th of August and not before, continued in full force until the 15th of May, 1911, when the tariff of that year became effective; that demurrage can be charged, or free storage allowed, only in accordance with the tariff in force at the time shipments are delivered to the carrier at point of origin; that all shipments of defendant prior to the 15th of May, when the new tariff took effect, were entitled at Toledo to the free storage provided in the previous tariff, because that tariff remained in force until the date named; and that, consequently, on such shipments the plaintiff could not lawfully impose demurrage before the 15th of August following.

It is conceded that the demurrage in dispute was assessed in accordance with the tariff of 1911, and that it accrued at the times and in the amounts claimed by the plaintiff. That is to say, the "rules and charges" of the new tariff were correctly applied to all loaded cars which had arrived at Toledo prior to the 15th of May and were then held there on yard storage. If, then, we assume, as defendant contends, that the old tariff was in effect until that date, it will at once be seen that the decisive question is whether plaintiff had the right, after accepting shipments at point of origin, and from a date of which the required 30 days' notice was given, to shorten the time that such shipments would be held at destination without charge for storage. In other words, could the plaintiff lawfully apply the new tariff to cars transported before the old tariff was canceled?

We are of opinion that this question must be answered in the affirmative. The opposing view, to say nothing else, overlooks the essential difference between the service of transportation, which must be furnished and paid for, and the accommodation of storage, which may or may not be provided. Broadly speaking, the former is a right which the carrier cannot deny or abridge, the latter a privilege which the carrier is at liberty to accord or refuse. One is obligatory, the other optional. This distinction is recognized in the regulating statute which, for example, requires the carrier's schedules to state separately all storage charges, and in the general practice of publishing such charges in a separate tariff. The freight rate in force at a given time is a unit by itself which measures, while it remains in force, the liability of the shipper for the service of transportation. In re Through Routes & Through Rates, 12 Interst. Com. R. 163. But that service is wholly disconnected, in fact and in law, with the optional allowance of yard storage, whether free or otherwise, after a shipment has reached its destination. And in respect of such storage, under either of the tariffs in question, each day is plainly a separate unit, because the shipper is free to avail himself of the privilege for whatever number of days he chooses, within the limits and upon the terms named in the tariff, or to release the cars at any time and thus avoid further payment or obligation. From this it follows that, whilst the freight rate in effect when a shipment is delivered to the carrier cannot be changed as against that shipment, the charge for optional storage at destination, when the transportation has been completed, may be lawfully increased, or the free time curtailed, upon and after the statutory notice. And it also follows that the tariff of 1911, under which the demurrage in question accrued, was "the tariff filed and in effect at the time," that is, from and after the 15th of May, and plaintiff was therefore bound under heavy penalty to strictly observe that tariff and assess demurrage accordingly. On that date the old tariff ceased to exist, for it was canceled in terms by the new issue, and the latter thereupon became the established standard of charges which plaintiff could in no wise disregard without the risk of criminal prosecution. Horton v. T. & G. R. Co. (D. C.) 225 Fed. 406.

[2] With the reasonableness or otherwise of this tariff we are not at all concerned, as that question is solely for the tribunal which ad-

ministers the statute. It is only for us to determine whether the cars transported before April 4, 1911, when the new tariff was issued and filed, as well as those transported between then and the 15th of May, when the new tariff went into effect, were subject to the "rules and charges" named and provided in that tariff. If defendant felt aggrieved by the announced intention to charge demurrage from the 15th of May instead of the 15th of August, there were ample remedies at its command. A protest could have been made, when notice of the new tariff was received, and the Commission asked to suspend it pending investigation. If that course were not taken or failed of success, a complaint of unreasonableness could have been filed, with demand for reparation, and the Commission would have had full authority, if it sustained the complaint, to order the tariff amended, or canceled altogether, and to award compensation for any injury which the defendant was found to have sustained.

Taking the facts and assumptions here considered in the aspect most favorable to defendant, we perceive no ground upon which its contention can be upheld. The service of transportation, as already pointed out, is entirely distinct from the privilege of storage at destination, and it seems clear to us that such storage should be governed by the demurrage tariff in force when the shipper avails himself of the privilege, if the required notice has been given, irrespective of the time when his cars were transported. Such a tariff is in no sense retroactive, for it applies only from a date of which the shipper has had such notice as the law presumes to be sufficient for his protection; and if he has reason to complain of a change which shortens the free time, or increases the per diem, the Commission has plenary power to afford him redress. A ruling to the contrary would not only be unfair to the carrier, but serve to give opportunity for the unjust discriminations which the commerce act especially seeks to prevent.

[3] The foregoing in effect disposes also of the claim for deductions from the aggregate charge because in certain cases—comparatively few in number—notice of arrival was not mailed to defendant on the day the cars reached the Toledo terminal. The sufficient answer to this claim is that nothing is found in the tariff in question, or in the statute under which it was issued, which required the plaintiff to give notice, by mail or otherwise; and the fact that notices were given, usually on the day of arrival, as a matter of courtesy or custom, does not imply any binding obligation on plaintiff's part, or entitle defendant to any set-off for the occasional instances of delayed notice. The point is fully covered by Hite v. Central R. of New Jersey, 171 Fed. 370, 96 C. C. A. 326, and the unreported opinion of the Commission in Pittsburg & Buffalo Co. v. Hocking Valley Ry., decided March 22, 1915. And here again it may be noted that if the 1911 tariff was faulty or defective, in failing to provide for notice of arrival, the Commission alone had authority to require its proper correction.

We agree with the court below that the defense set up is without legal merit, and the judgment in favor of plaintiff must therefore be affirmed.

SMITH, District Judge (dissenting). What appears to me the magnitude of the consequences that might follow from the erroneous conclusion of the court in this cause if generally applied to mercantile transactions of the character involved in the present case compels me to dissent. The evidence and admitted facts in the case were to the effect that the railroads, in order to obtain use for their cars at a dull season of the year, offered the shippers of coal by the tariff marked "Exhibit A" that if they would ship coal during certain months, they could have the privilege, so to say, of free storage, until navigation was opened up on the lakes and all opportunity given for the water transportation. By this tariff proposition no demurrage was to be charged on such coal shipments between 1st January and 15th August in each year. This was a perfectly clear and understandable proposition. The railroads said to the shippers of coal that during the period when water navigation was closed, transportation and the use of railroad cars to ports on the lake necessarily ceased, and their cars would be useless. To remedy this and to offer an inducement to coal shippers to give employment to cars, the railroad company notified all coal shippers who would ship coal after the 1st of January that they should not be charged with demurrage until the 15th of August in each year, i. e., should have free storage. After that date, viz. 15th August, on all coal arriving, or remaining on hand, with the railroads for which water transportation had not been provided, shippers would be charged demurrage. This tariff or contract offer by its terms remained in force until due notice was given of its cancellation. Acting upon this tariff the plaintiff in error, defendant below, shipped coal after the 1st of January, 1911, which coal was in course of transportation and out of the defendant's possession and on its way to the water port when the plaintiff below on 4th April, 1911, undertook to issue another tariff, Exhibit B, whereby this privilege of freedom from demurrage or free storage was canceled from and after the 15th day of May, 1911. The result of this change was that shippers who had already shipped their coal prior to notice of this change, which coal had passed from their possession into the hands of transporting carriers, and who had shipped it upon the hypothesis that they would be given storage without demurrage charges until the 15th of August under the tariff then in force, were notified, notwithstanding the arrangement made, that this agreement would be arbitrarily canceled and the coal which they had shipped already under and by virtue of the agreement, and depending upon it, would be charged storage. This was a plain violation of the contract, and one which destroyed the power of the shipper desiring to make contracts to deliver, to make those contracts based upon any definite mathematical calculation of what the expenses would be as affecting the prices at which deliveries should be made. As, for instance, if a coal dealer on the 1st February desired to fill an order for coal to be delivered in, say October, in making his estimate of the price at which he could deliver, he would be justified under the existing tariff in estimating that if he could get his coal to the port and provide water freight room before the 15th August, he would not be called upon to pay demurrage. To allow the transportation company delivering the coal at the port to arbitrarily

and suddenly cancel this agreement, after the coal has left the hands of the shipper, and gone into the possession of the transportation company would not only disorder the channels and methods of trade, but might ruin the individual shipper. Assuming that there is an essential difference between the service of transportation which must be furnished and paid for and the accommodation of storage, which may or may not be provided, and that the former is a right which the carrier cannot deny or abridge, the latter a privilege which the carrier is at liberty to accord or refuse, and that the former is obligatory and the latter optional, then and in that case there is less justification in permitting the carrier arbitrarily to annul a contract in the shape of an offer which was not obligatory on him, but purely optional. If it was optional for him to make it, and it was made for consideration, and accepted and acted upon by the other party to it, then there is no question whatsoever of public service regulation which would interfere to hold the contract not binding between the two.

The learned judge who heard the cause in the court below was of the opinion that the tariffs were "seasonal," i. e., of force only for the navigation season of lake transportation defined therein; which under the tariff set out as Exhibit A is defined as extending from August 15th to December 21st. That it expired on December 31, 1909, and must be presumed to have been again issued on July 12, 1910. There appears no sufficient ground for this hypothesis. This tariff was not again issued, but all parties seemed to have acted under it in 1910 as if it still continued in force. By its very terms the rules and charges therein are declared effective *each year* from August 15th to December 31st inclusive. It would seem that for all cars shipped prior to notice of the change in the tariff or storage charged, and which cars therefore had been placed out of the possession of the shipper in reliance on the contract, the other party was not in a position to refuse the consideration, and as to all these cars the judgment of the court below was erroneous and should be reversed.