## NORTH AMERICAN COAL CORPORATION v. WHEELING & L. E. RY. CO.

### No. 5704.

Circuit Court of Appeals, Sixth Circuit.

April 15, 1931.

H. H. Hoppe, of Cleveland, Ohio (Taplin & Fillius, of Cleveland, Ohio, on the brief), for appellant.

A. E. Powell, of Cleveland, Ohio (Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

HICKS, Circuit Judge.

Appellee sued to recover the sum of $2,101 as demurrage on 157 cars of coal. The solution of the controversy depends upon the proper application of certain demurrage rules published and filed by appellee with the Interstate Commerce Commission and the Public Utilities Commission of Ohio.[1]

The facts are undisputed. The coal was shipped for appellant's account over appellee's railway to Huron, Ohio. There it was loaded by appellee into the steamer Upson for trans-shipment for appellant upon Lake Erie to points beyond Ohio. In December, 1923, the Upson moored at the south end of the ore slip in the river at Huron and about 3,000 feet from the coal slip. As so located, other boats mooring afterward became an obstruction to her passage into the river. About the same time the steamer Worrall Clarkson, chartered by third parties to carry coal hauled and loaded by appellee, moored for loading under the loading machines in the coal slip. About the 1st of January, 1924, the entire port began to freeze and remained frozen through February. Both boats and all other shipping in the harbor were frozen in. The mean temperature for January was 23.4 degrees and for February was 26.1 degrees. The lowest temperature in each month was 10 degrees below. The ice was from 15 to 24 inches in thickness. Under these conditions, it was practically impossible to move either vessel. If the ice by any reasonable effort could have been broken up, it could not have been cleared from the harbor. The coal destined for the Upson arrived from February 6th until and including February 27th. The Clarkson's cargo had also arrived. Early in March the weather moderated, and the Cleveland Stevedore Company, operating the docks for plaintiff, sawed out the Clarkson, loaded her, broke up the intervening ice, and moved her into the river. About the same time two tugs were employed by appellee to break the ice in the harbor. After the harbor and river were cleared, the tugs broke into the ore slip, released the Upson, and moved her at her own expense to the point under the loading machines vacated by the Clarkson. It was not the duty of appellee to dock the Upson for loading. Just when either vessel began to load is unimportant because the parties have stipulated that, if appellant is liable, the amount sued for is correct. It is sufficient to state that no demurrage was charged after the loading of the Clarkson began.

---

[1] "WLE Freight Tariff No. 47-H, I. C. C. No. 1415, and Ohio No. 914.

"Rule 1.—Computing Time. (a) Five (5) days, of twenty-four (24) hours each, free time will be allowed, to be computed on the basis of the detention to all cars released during each period.

"(b) Time will be computed from the first 7:00 a. m. after the day on which written notice is sent or given to the consignee of the arrival at Cleveland, Huron, or Toledo, Ohio; such notice to contain point of shipment, car initials and numbers, contents, and if transferred in transit the initial and number of the original car.

"(c) 1. All cars of a cargo or fuel supply shall be considered released on the day first car is loaded into the vessel, including all cars arriving subsequently to the arrival of the vessel of whose cargo or fuel supply they form a part, provided the freight charges thereon have been paid or satisfactory arrangement for payment has been made at the time vessel reports, except that when, for convenience of the railroad, to prevent unnecessary switching cars are not dumped in order of their arrival, the dates on which the substituted cars are dumped will be used in computing the detention of the cars for which they are substituted so that, as far as credit and debit days are concerned, the record will be the same as though the cars were dumped in the order of their arrival.

"2. When the vessel is unable to dock because other vessels are at loading machines, and is thereby delayed in receiving its cargo or fuel supply, cars of that cargo or fuel supply shall be considered released as of the day the vessel reported and would have docked."

Appellant's contention is that even before the time its coal arrived the Upson had "reported"; that, because the Clarkson then occupied the berth at the loading machines, the Upson was delayed in receiving its cargo, and that therefore clause 2 of subsection (c), rule I of the Demurrage Rules, relieves it of liability. We cannot assent. We think that clause 2 of subsection (c) presupposes a situation wherein a vessel is at hand ready and waiting its turn at the machines but is delayed because the loading docks or berths are occupied by other vessels taking on cargo. See Hite v. Central Railroad of N. J., 171 F. 370, 373 (C. C. A. 3). Such was not this case. Passing by whether the Upson, although moored 3,000 feet away, had "reported" in the sense that she could under ordinary conditions have promptly taken her place at the machines after the Clarkson had cleared, it is apparent that the inability of the Upson to dock and the consequent delay in receiving its cargo was not due to the presence of the Clarkson. The Upson was incapable of moving, she was icebound. This was her situation even before she was designated by appellant for loading. The presence of the Clarkson was an incident only. No delay caused by it has been charged for. Had the entire harbor been clear of shipping, the same result would have followed. The demurrage rules have provided no exception on account of ice-locked ports, and we can make none. See, Sinclair Ref. Co. v. Schaff, 275 F. 769, 774 (C. C. A. 8).

Appellant excepted to the exclusion of certain testimony offered, including its Exhibits A, B; and C, upon the theory that this evidence tended to show that appellee had contracted to ship and load the coal into the Upson after it knew that the Upson was ice-locked. We find nothing relevant in the proposed testimony. There was an embargo upon all goods arriving in port by rail for shipment across the lake. To regulate such shipments, there was maintained by the port railroads and shippers an organization styled "Ore and Coal Exchange." The shipper applied to the exchange, and the exchange in turn to the port railway, and the shipper, after agreeing to pay the freight, was then allowed by the port railway to ship, and the exchange notified the shipper and all the carriers, including the initial carrier. The purpose was to regulate and control lake shipments at their point of origin. The testimony offered indicates no intent to in any way modify the demurrage rules.

Affirmed.