**WESTERN OIL & FUEL CO.**

v.

**GREAT LAKES PIPE LINE CO.**

No. 14917.

United States Court of Appeals, Eighth Circuit.

Feb. 19, 1954.

Rehearing Denied March 19, 1954.

Perry R. Moore, Minneapolis, Minn. (James L. Hetland, Jr., Minneapolis, Minn., on the brief, Mackall, Crounse, Moore, Helmey & Palmer, Minneapolis, Minn., of counsel), for appellant.

Robert M. Weh, Cleveland, Ohio (John C. Benson, Minneapolis, Minn., R. L. Wagner, Chicago, Ill., and T. H. Burgess, Cleveland, Ohio, on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This action is brought by a common carrier pipe line company to recover demurrage charges from a shipper of gasoline and fuel oil distillate under a tariff duly filed with the Interstate Commerce Commission. The carrier operates an extensive pipe line system through which it pumps petroleum products delivered to it at various points of origin. At each point of origin it maintains extensive storage facilities. Deliveries are made to the carrier by delivery of the oil into large storage tanks. From these tanks it passes into the pipe line, through which it is propelled, and at

various points of destination it is placed in large storage tanks belonging to the carrier. The method of delivery at destination consists of the oil being pumped by the carrier out of the storage tanks, through a pipe to the carrier's so-called loading racks, where by means of either railroad tank cars or motor tank trucks, furnished by the consignee, the oil is taken away by the consignee. It is impossible to deliver oil to the carrier at points of origin or to take delivery by the consignees at points of destination without the oil first going into the carrier's storage facilities at both places.

There are three tariffs involved in the present action. The first, chronologically, is Tariff No. 162, which was in effect from 1947 until October 1, 1951. It provided that ninety days' use of the carrier's storage facilities was available to the shipper without charge. The next tariff, in point of time, No. 170, effective October 1, 1951, and its Supplement, effective October 31, 1951, reduced the ninety-day period to sixty days. The third, No. 172, became effective January 1, 1952, and further reduced the foregoing period of time to thirty days. In all other material respects each of the tariffs was the same. Some of the shipments involved were delivered to the carrier during the time Tariff No. 162 was in effect; the remainder were delivered at the time Tariff No. 170 and its Supplement were in effect. All shipments were delivered to the carrier prior to the effective date of Tariff 172, January 1, 1952. All demurrage charges which are claimed by the plaintiff accrued after January 1, 1952. None of the shipments was held in the carrier's storage tanks longer than Tariffs 162 or 170 permitted without the accrual of demurrage charges.

The cause was submitted to the trial court on motion for summary judgment and affidavits filed by each of the parties. The facts are not in dispute. It it agreed that if Tariff 162 applies to the shipments which originated while it was in effect, and if Tariff 170 applies to the shipments which originated while it was in effect, there is no demurrage due plaintiff. Tariff No. 172 went into effect after all of the shipments involved had been delivered to the carrier but before final delivery and removal of the oil by the consignees. It is conceded that if Tariff 172 applies to these shipments, the demurrage claimed is correct. The trial court held that Tariff 172 applied and gave plaintiff judgment for the amount claimed. The defendant appeals from that judgment.

The vital provisions of each of the three tariffs are, as stated, identical except as to the ninety-, sixty-, and thirty-day periods fixed in each. Those provisions appear under the heading "Demurrage Charges" and are as follows:

"Demurrage Charges

"Section A—Except as provided in Item No. 55, the carrier will transport and deliver at the terminal point, with reasonable diligence, the quantity of Gasoline or Petroleum Fuel Oil Distillate accepted for transportation, less deductions, or plus additions account temperature corrections, and will furnish such reasonable facilities, including tankage in transit and at terminal point, as are required for such transportation or will facilitate the efficient operation of its lines.

"Section B—Except as provided in Sections C and D, the consignee shall receive and remove from carrier's tankage without undue delay the Gasoline or Petroleum Fuel Oil Distillate which has been made available for delivery at terminal point for its account. Unless such Gasoline or Petroleum Fuel Oil Distillate is removed from carrier's tankage facilities at the close of a thirty (30) day period, counting from the day the Gasoline or Petroleum Fuel Oil Distillate was made available for delivery at the terminal point, reduced by the number of days which such Gasoline or Petroleum Fuel Oil Distillate accepted under Section B of Item 15 has been held at point of origin for the purpose of accumulation as therein provided, it shall be subject thereafter to a demurrage

charge of one cent a barrel a day until removed."

The defendant contends that the thirty-day period is time allowed for loading and unloading; that by the fixing of this definite period the tariff is merely making definite and certain the words "without undue delay." Plaintiff contends that the thirty-day period is free storage time. It must be conceded that if this "free time" period is a necessary incident to the transportation service for which the transportation rate was paid, it could not be withdrawn, changed, or modified after the contract of carriage was made by delivery of the shipments to the carrier. It must likewise be conceded that if the free time period is a storage privilege, such a service or privilege is not a necessary incident to the actual transportation service for which the transportation rate was paid and may be changed or withdrawn by Tariff 172 after the shipments began.

██ The courts may not construe technical or abstruse terms appearing in a tariff, the meaning of which requires evidence and the special knowledge of those learned in the vernacular sometimes peculiar to rate experts. That is the province of the Interstate Commerce Commission. But if a term has been construed by the Commission, the courts may apply that construction without the necessity of repeatedly relegating that duty to the Commission. When ordinary words are used in their ordinary sense, the construction of the tariff is one of law for the courts. The only term, the meaning of which is important here, which appears in these tariffs and which has a technical meaning is the term "transportation."

██ The extent of the service which "transportation" embraces is important in determining whether the thirty-day period was an incident thereto and is a part of the service for which the transportation rate was paid. Transportation service for which that rate is paid has been defined by the Commission to include the time reason-

ably necessary for loading and unloading. In Lake Coal Demurrage, 232 I.C. C. 735, 740, the Commission said:

"The charge for transportation from origin to destination includes tender of delivery and the placement of the car in position for loading and unloading or on a designated track or tracks. An obligation rests upon the carrier to allow a reasonable time for loading and unloading. This is known as free time and is included in the line-haul rate."

To the same effect are Peale, Peacock & Kerr v. C. R. R. Co. of N. J., 18 I.C.C. 25 and Eastern Shore of Va. Prod. Exc. v. Pennsylvania R. Co., 179 I.C.C. 642. It was therefore incumbent upon the carrier in this case to allow, as a necessary incident to the transportation and without extra charge therefor, a reasonable time for loading and unloading. The reasonableness of the time allowed is for the Commission to determine. We are not now concerned with that problem. But if no time other than the thirty-day period is provided for that purpose and the law requires that some time therefor be furnished free of charge, then the thirty-day period must be construed to be for that purpose. We find no suggestion in the tariff of any other time allowed for that purpose. If the argument be advanced that the requirement that shipments be removed "without undue delay" implies a separate allowance of time for loading and unloading, the language of Section B—"Unless such Gasoline or Petroleum Fuel Oil Distillate is removed from carrier's tankage facilities at the close of a thirty (30) day period, *counting from the day the Gasoline or Petroleum Fuel Oil Distillate was made available for delivery at the terminal point, * * *"* is a complete answer. For by that language demurrage commences thirty days from the date notice is given the consignee that the oil is ready for delivery, without qualification or any exemption for removal, expeditious or otherwise. We must conclude, therefore, that the thirty-day period must be construed to be time for loading and unloading.

Plaintiff asserts that to construe the thirty-day period as loading and unloading time is absurd. It points out that the same period had previously been ninety days, and sixty days and that the period was successively reduced because of extensions in the pipe line system, with attending increase in volume of business and need for its storage facilities, without regard to the time necessary for loading and unloading. It is further argued that the time necessary for plaintiff to pump each shipment involved from its storage tanks at the destination points ranged from a few minutes to only a few hours. The time necessary for that purpose does not measure the reasonable time necessary for the consignees to furnish tank trucks or cars to convey it away. At best those arguments could only establish the premise that the thirty-day period was furnished for both loading and unloading and also for free storage.

■■■■ But we are precluded from construing this thirty-day provision as being for both purposes by the legal requirement in Section 6(1) of the Interstate Commerce Commission Act, 49 U.S.C.A. § 6(1), that charges and services be separately stated in the tariff. The material portion of Section 6(1) is:

"Every common carrier subject to the provisions of this chapter shall file with the commission created by this chapter and print and keep open to public inspection schedules showing all the rates, fares, and charges * * *. The schedules printed as aforesaid * * * shall also state separately * * * all privileges or facilities granted or allowed * * * which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, *or the value of the service rendered* to the * * * shipper, or consignee." (Italics ours.)

This Act does not prevent the giving of free storage rights if specified in the tariff. Nor does it prevent such free storage rights which are not incidents to the transportation being taken away by a change in the tariff after the ship-

ment has begun. It does mean, however, that the free time for loading and unloading, which may not be taken away after the shipment has commenced, and such free time as may be allowed for storage and which may be taken away by a change in the tariffs after shipment has commenced, be separately stated in order that the shipper may know what free time he can rely upon as remaining constant throughout the shipment, and what free time, also of value to him, may be taken away by a change in the tariff after the shipment begins.

Unless the loading and unloading time be separately stated from the free storage time, the shipper or consignee cannot know the value of the service to be rendered by the carrier which he can depend upon to continue from the date of delivery to the carrier to the date of delivery to the consignee. If they are stated separately, the shipper can by reference to the tariff determine the time fixed by the Commission as the reasonable time for loading and unloading, which period will remain constant and not subject to change throughout the entire time the shipment is in the possession of the carrier. And if the free storage time is separately stated, the shipper will know in advance that this time may be modified or eliminated entirely after the beginning of the shipment and before its final delivery, and, hence, that he cannot rely upon it remaining constant. But if they are not stated separately, there is no way for him to determine in advance the value of the service to be rendered by the carrier; or, otherwise stated, how much time he can depend upon for loading and unloading and how much of the total so-called free time is storage time, the continuance of which he cannot depend upon.

■■■ Plaintiff contends that the thirty-day period cannot be held to be time for loading and unloading because the shipper or consignee neither loads nor unloads. It appears that there is a permanent physical connection between the facilities of the refineries, who occupy

the position of shippers, and the carrier's storage facilities at points of origin. But even so, the shipper must participate in the "loading" by propelling the oil from the refineries to the carrier's tanks, which must of necessity take some time, however short or long, which is a necessary incident to the transportation and for which extra charge may not be made. At the point of destination the consignee must furnish vehicles into which the oil is pumped and by which it is removed. Again, this is an essential incident to the transportation and time must be allowed therefor. It cannot be said that the shipper or consignee does not participate in the loading and unloading and hence need not be allowed free time for its part in those operations.

The further argument is advanced that the Commission in Petroleum Rail Shippers Assn. v. Great Lakes Pipe Line Co., 243 I.C.C. 589, 665, has construed the entire thirty-day period as being storage time, wherein it was said:

"We further find that the minimum-tender requirements of Great Lakes Pipe Line Company and Phillips Petroleum Company, namely, 25,000 barrels, are reasonable when normal transportation service is demanded; that a reasonable minimum tender when gasoline or kerosene is offered for transportation subject to delay until defendants have accumulated at that receiving point 25,000 barrels of the same specifications from the same or other shippers, is and for the future will be 5,000 barrels, and that any greater minimum-tender requirement when so offered subject to delay is and for the future will be unreasonable, but that the time during which such shipments are thus necessarily stored at origin shall be deducted from the storage time now allowed at destination without additional charge and that the storage time at destination without additional charge shall be correspondingly reduced."

On the contrary, the most favorable import to plaintiff which may be given that language, in the light of the absolute legal requirement that free time be allowed for loading and unloading, is that the thirty-day period was construed by the Commission to be for both loading and unloading and also for free storage. The Commission was referring to the fairness and reasonableness of deducting that part of the free time allowed at point of origin, left after the legally required reasonable time for loading and unloading, which was treated as free storage time, from the free storage time, if any, left at point of destination. If we had the right to do so we would find no fault with the Commission's finding of the fairness or reasonableness of such a provision in that tariff. A similar provision appears in the tariffs in this case. But for reasons heretofore stated, the Commission could not legally construe the thirty-day provision as being for both purposes without each being separately stated.

The cases cited by the plaintiff [1] illustrate the distinction between free time allowed for necessary incidents of transportation and free time allowed for storage. In none of those cases does it appear that there was no separate definite time allowed for loading and unloading. In each of those cases it was held that free time storage periods could be changed after the shipment began. But in none was there an intimation that loading and unloading time was not a necessary incident to the transportation or that it could be changed after the shipment began.

1. Chesapeake & Ohio Coal & Coke Co. v. Toledo & O. C. R. Co., 4 Cir., 245 F. 917; Chicago & Erie R. Co. v. Berwind-White Coal Mining Co., 171 Ill.App. 302, affirmed, 235 U.S. 371, 35 S.Ct. 131, 59 L. Ed. 275; Getz Bros. & Co. v. Director General, 85 I.C.C. 673; Horton v. Tonopah & Goldfield R. Co., D.C., 225 F. 406; Indiana Harbor Belt Railroad Co. v. Jacob Stern & Sons, D.C., 37 F.Supp. 690; Krauss Bros. Lumber v. Director-General, 92 I.C.C. 450; Manassa Timber Co. v. L. & N. Railroad, et al., 115 I.C.C. 421; Morris Run Coal Mining Co. v. N. Y., Susquehanna & Western R. R., 253 I.C.C. 439.

For the reasons stated, the judgment is reversed and the cause is remanded for further proceedings consistent herewith.